**YOUNG ISRAEL ORGANIZATION OF CLEVELAND, Relator, v. DWORKIN et, Respondents.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 23355. Decided March 14, 1956.

Simon Amdur, for relator.
Clifford H. Bernard, for respondents.

## OPINION

By HURD, J:

The relator, The Young Israel Organization of Cleveland, a non-profit corporation, organized for religious purposes, has invoked the original jurisdiction of this Court for the purpose of obtaining a writ of mandamus to require the respondents, officials of the City of South Euclid, Ohio, to issue to the relator a permit for temple congregational or church purposes.

Respondents are the duly qualified and acting members of the South Euclid Zoning Board of Appeals and the duly appointed acting Building Director of the City of South Euclid, Ohio.

From stipulations entered into between the parties and accompanying exhibits which include the zoning ordinance of the City and amendments, the zoning map, which is made part of the ordinance, and other documentary evidence, we find certain salient facts condensed as follows:

The application of relator is for a permit to build a synagogue on a parcel of land consisting of six lots, having a frontage of 300 feet on Cedar Road in the City of South Euclid extending back of equal width 163 feet for a total area of 49,500 square feet, or more than an acre in extent.

Cedar Road is a county highway seventy feet in width, the center line of which is the south boundary of the City of South Euclid extending from the westerly limits through to the easterly limits of the City. At the present time the paved portion of Cedar Road in front of the premises is twenty-four feet in width. Directly across Cedar Road is the City of University Heights. Thus the south boundary of South Euclid forms the north boundary of University Heights.

It is stipulated that the north side of Cedar Road from Warrensville center road eastward in the City of South Euclid to the corner of Miramar Boulevard is vacant land except for a single dwelling on the northwest corner of Miramar Boulevard and Cedar Road. On the northeast corner of Miramar Boulevard and Cedar Road is a single family dwelling, then to the east of that dwelling is the vacant property involved in this proceeding. The property in South Euclid surrounding the three sides of the property in question is entirely occupied by single family dwellings but across the road in the City of University Heights from Warrensville Center Road eastward is a golf course which runs to Miramar Boulevard. Thereafter, extending for many hundreds of feet eastward in the City of University Heights and directly across Cedar Road from the property in question is a large apartment house development containing approximately four multiple dwelling buildings and further eastward on Cedar Road in University Heights is a Masonic Temple. Also, almost directly across Cedar Road in University Heights and to the rear of the multiple family dwellings is Wiley Junior High School which presently is being used by a branch of relator's congregation for temporary church services.

At all times mentioned in the petition and amended petition Ordinances Nos. 359, 2107, 2127 and 21-53 of the City were in full force and effect and the property in the petition described is classified in a U-1 single family dwelling use district. However, in June of 1952, the six lots, as were others eastward from relator's site, were zoned for a U-2 or two family use as appears by the zoning map and correspondence in evidence.

After the application for a permit for a synagogue was made, the City changed the classification from U-2, two family residence use, to U-1, single residence use, and on May 4, 1953, also, after the application for church uses was made, the City adopted an ordinance as an emergency measure to change the zoning ordinance with respect to auto parking which would require one space for each four seats instead of one space for each ten seats as theretofore provided.

The first evidence shown in the exhibits of the refusal to grant relator's application for a permit is contained in a letter of the City Zoning and Planning Commission of South Euclid dated November 20, 1952, signed by the Chairman, in which the Commission advises that the request for a rezoning of the property should be denied. At the same time it is stated in the letter that "the entire Zoning and Planning Commission feel that a temple or synagogue in South Euclid would fill a real need for some of our residents."

Prior to June 12, 1953, the respondent City, as appears by exhibits in evidence, advised relator to make application for a rezoning of the lots in question from U-2 to U-3 uses for temple or congregational purposes. On June 12, 1953, relator, in writing, requested a tentative building permit to erect a synagogue on the same property. Again on November 4, 1953, relator applied in writing for a permit and submitted to the City's Building Department complete plans and specifications. No objection was raised as to the plans and specifications as such, but on April 7, 1954, the City, through its Planning and Zoning Commission, denied Relator's application.

Thereafter, within the time prescribed by ordinance, relator perfected its appeal to the Board of Appeals on Zoning and Building Standards, a body established by ordinance of the City of South Euclid to hear appeals from the orders of the building authorities, and on July 9, 1954, the Board of Appeals rendered its decision sustaining the City Planning Commission and the Building Commissioner in refusing to issue the permit.

The record also shows that previously the **President of Council** of South Euclid had advised the President of relator that the **Zoning and Planning Committee of Council** had recommended that the request of relator for a change of zoning be denied, as appears by letter dated March 24, 1953 (Exhibit 5-F).

It is stipulated that members of relator are adherents of the orthodox segment of the Jewish faith and as such they are prohibited from performing any manner of labor on the Sabbath and on holidays and using any form of transportation, except walking to the place where their religious services are held on those days. Other services are held in the morning and evening of each day but these services are sparsely at-

tended. Holidays and Festivities are observed by abstinence from all manner of work and the day is spent in meditation and study. The Sabbath and Holiday begin at sunset of one day and end at sunset of the following day.

Because they adhere to this faith their places of worship must be within walking distance of their homes. The site on which relator desires to build is within walking distance of part of the members of the relator organization.

Those members who cannot, by reason of distance, attend Sabbath and Holiday services by walking to the site in question, will continue to use the facilities now in existence (at other locations), except Wiley Junior High School, which will be closed in the event the site in question may be used.

The members of the relator organization believe that their youth be taught, educated and trained to follow in their footsteps and for that reason it is intended that the proposed building will be used for teaching and training of the youth of the relator organization members. Therefore, the building plans as submitted by the respondents designate certain rooms in the proposed building as meeting rooms, club rooms and class rooms for the purpose of study and training.

The relator's building plans provide for a one-story building 120 feet long from a 10 foot setback at the easterly end of the building site and 85 feet at its deepest part, and a 30 foot setback fronting on Cedar Road. The westerly part of the site is devoted to auto parking spaces as is the rear 50 feet of the entire site. There is provision for eighty-one auto parking places. Suitable landscaping is provided as appears from the plans and specifications with shrubbery on the side and rear lines separating the area from neighboring properties.

On August 2, 1928, original Ordinance No. 359 was adopted by the Village of South Euclid, now a City, establishing a comprehensive plan of zoning. Certain amendments were thereafter adopted. An amendment adopted in October of 1951 by Ordinance No. 2107 provided for the creation of a Board of Zoning and Building Standards, Board of Appeals, a Board separate and apart from the presently existing City Zoning and Planning Commission. The Appeals Board was given power to decide any question involving the interpretation of the ordinance and to grant variances from the strict letter of the ordinance in instances of unnecessary hardship.

By the original ordinance, the entire area of the municipality is divided into six classes of use districts from U-1 to U-7, inclusive. We are concerned here with three only as follows: U-1 provides for single family dwellings, public parks, water towers and reservoirs, suburban and interurban electric railway passenger stations and rights of way, not including railway yards, and farming, non-commercial greenhouses, nurseries, and truck gardening; U-2, which provides for two-family dwellings; U-3 provides for apartment houses, hotels, churches, schools, public libraries, museums, private clubs, community center buildings, hospitals, sanitariums, public playgrounds and recreation buildings and a city hall and courthouse. (Emphasis added.)

Section 11 of the Ordinance, entitled "Use District Exceptions," provides in part as follows:

"The City Planning and Zoning Commission may in the event of **property being allotted which was undeveloped at the time this Ordinance was passed and in other specific cases, after public notice and hearings and subject to such conditions and safeguards as the commission may establish, determine and vary the application of the use district regulations herein established, which permission shall be confirmed by resolution of the Council before becoming effective, as follows:**

(c) **Permit in a use district any use deemed by the Commission in general keeping with the uses authorized in such district."** (Emphasis added.)

The action of the City in refusing a permit to the relator to erect a synagogue of the type and kind set forth in the application, as shown by its plans and specifications, is challenged as being unreasonable and arbitrary as applied to relator's lands. It is contended that the ordinance as it relates to relator's land and the action of the City in respect thereto bears no substantial relation to the public health, safety, morals or general welfare of the community and is, therefore, in derogation of the constitutional rights of the relator and an unwarranted interference therewith.

The City defends on the ground that mandamus is not the proper remedy and that its action in denying the application of relator, the right to use its property for church purposes, does not violate constitutional rights because by ordinance it places churches in a U-3 residential classification instead of a U-1 residence classification.

In considering these conflicting claims, it is well to note the efforts of relator to secure relief from the various governing bodies of the City. The evidence shows that the City conceded the need for a temple or synagogue for some of its residents, as indicated by the letter in evidence of the City Zoning and Planning Commission of November 20, 1952. The various legally constituted agencies of the municipality notified relator of their refusal to grant permission through written communications in chronological order as follows: (1) By the City Zoning and Planning Commission November 20, 1952 (Exhibit 5E); (2) By the Building Commissioner June 12, 1953 (Exhibit 4C); (3) By the City Council through the President with authority of the Zoning and Planning Committee of Council March 24, 1953 (Exhibit 5F); (4) By the City Planning Commission April 7, 1954 (Exhibit 6D); (5) By the Board of Appeals on Zoning and Building Standards July 9, 1954 (Exhibit 7).

The record indicates, as disclosed by the exhibits, that public hearings and negotiations concerning these applications extended over a period of about two years.

The first question presented is whether mandamus is a proper remedy. In this connection it should first be noted that the constitutionality of the zoning ordinance is not being challenged as a whole as was the case in Village of Euclid, Ohio v. Ambler Realty Company, 272 U. S. 365, 71 L. Ed. 303, and in Lieux v. Westlake, 154 Oh St 412. Rather, the challenge here is to the constitutionality of the municipal ordinance

as it applies only to the use of relator's lands for church purposes as was the case in State ex rel. v. Joseph, 139 Oh St 229 and State ex rel. v. Bruggemeier, 97 Oh Ap 67. It has been held that mandamus is a proper remedy to compel the issuance of a permit where the constitutionality of the ordinance is assailed when applied to particular lands. It was so held by this Court in the recent analogous case of State ex rel v. Bruggemeier, supra. In that case, the relator commenced an action in mandamus in the Court of Common Pleas wherein the writ was granted. On appeal to this Court, the judgment was affirmed and the motion to certify was overruled by the Supreme Court February 17, 1954. In State ex rel. v. Joseph, supra, the action of the Court of Appeals in ordering the issuance of a peremptory writ of mandamus to grant a special permit to the relator for the erection of a church was affirmed. The doctrine set forth in these cases is in accord with the great weight of authority throughout the country. Thus in the annotations entitled "Attack on Zoning Regulations," 136 A. L. R. at page 1388, it is stated in part:

"The procurance of a building permit from a designated administrative officer is frequently required by statute or ordinance as a condition to the right to erect or alter a building or other structure upon real property. In many instances such a permit is refused by the administrative official applied to, on the ground that the erection of the proposed building or the proposed alteration of an existing building would constitute a violation of the applicable zoning ordinance. As is shown in 34 Am. Jur. 961, Mandamus, paragraph 188, the view is generally taken that where the foregoing situation is presented, the constitutionality or validity of the zoning enactment relied upon as a ground for refusing a permit may be raised in a proceeding in mandamus to compel the issuance of a permit." The text is supported by numerous authoritative decisions.

There is a division of authority in reported cases as to whether the relator must exhaust administrative remedies before appealing to the courts for relief. Authoritative cases in Ohio are to the effect generally that exhaustion of administrative remedies, where such are provided by ordinance, must be had before resort to the courts for relief Lieux v. Westlake, State ex rel v. Joseph, State ex rel. v. Bruggemeier, supra.

In this respect the instant case must be distinguished from the recent case of the Heights Jewish Center v. Carl M. Haake et al, recently decided by this Court, wherein an application for a writ of mandamus was denied because relator had failed to exhaust administrative remedies before seeking a permit which constituted a variance on the ground of hardship. (Case No. 23488, Court of Appeals, Eighth Appellate District, decided February 8, 1956.) This case also must be distinguished from the recent case decided by this Court November 23, 1955, entitled Curtis v. City of Cleveland et al. (Case No. 23398), which was an action in equity where no permit was requested but a mandatory injunction was sought in an action for declaratory judgment, it being there held that application to the city authorities for a change of zoning was not

a prerequisite under the circumstances of that case before application to the court for relief.

In the instant case, the record shows that all administrative remedies provided for by the Ordinance were completely exhausted. The exhaustion of such remedies does not constitute a bar to this action. State, ex rel v. Joseph, supra. Consequently, we hold that this case comes properly before this Court by way of proceeding in mandamus.

We come now to a consideration of the second and more important question as to whether the denial of relator's application to erect a temple of worship of the kind and character described has any reasonable relationship to the public health, safety, morals and general welfare as applied to relator's land. This necessarily involves also the question of the constitutionality of the ordinance as applied to relator's land for church purposes.

In Bassett on Zoning (1940 Edition) at page 200, under subject, Churches, it is stated:

"Practically all zoning ordinances allow churches in all residence districts. It would be unreasonable to force them into business districts where there is noise and where land values are high, or into dense residence districts (in cities which have established several kinds of such districts). Some people claim that the numerous churchgoers crowd the street, that their automobiles line the curbs, and that the music and preaching disturb the neighbors. Communities that are too sensitive to welcome churches should protect themselves by private restrictions."

In Yokley, Zoning Law and Practice (Second Edition 1953), Vol. 2, Section 222, at page 110, the author states in part:

"Since the advent of zoning, churches have been held proper in residence districts. Both the early decisions and the more recent ones frown on the exclusion of churches from residence districts, in spite of the temporary inconvenience sometimes experienced in connection with the parking of automobiles and other inconveniences incident to the gathering of crowds in residence areas."

In Board of Zoning A. v. Decatur, Ind. Co. of Jehovah's W., 117 N. E. 2d 115, at page 119, the Supreme Court of Indiana, speaking through Bobbitt J., states:

"The law is well settled that the building of a church may not be prohibited in a residential district. State, ex rel. Roman Catholic Bishop of Reno v. Hill, 1939, 59 Nev. 231, 90 P. 2d 217; **State, ex rel. Synod of Ohio v. Joseph,** 1942, 139 Oh St 229, 39 N. E. 2d 515, 138 A. L. R. 1274; Ellsworth v. Gercke, 1945, 62 Ariz. 198, 156 P. 2d 242; North Shore Unitarian Soc. v. Village of Plandome, 1951, 109 N. Y. S. 2d 803, 200 Misc. 524; Yokley, Zoning Law and Practice (2d Ed.) Vol. 2, Section 222, p. 110; 58 Am. Jur., Zoning, Section 125, p. 1010."

In O'Brien v. City of Chicago, 347 Ill. App. 76, 105 N. E. 2d 917, the court declares at page 920:

"In this respect it is well to note that of the many cases we have examined, there is not a single instance, with the exception of a decision by an intermediate court in California, Corporation of Presiding Bishop v. City of Porterville, 90 Cal. App. 2d 656, 203 P. 2d 823, where

the courts have sustained prohibitions on the erection of churches in any area. State, ex rel. Howell v. Meader, 109 W. Va. 368, 154 S. E. 876; State v. Hill, supra; State v. Joseph, supra; City of Sherman v. Sims, supra; Ellsworth v. Gercke, 62 Ariz. 193, 156 P. 2d 242; Pentecostal Holiness Church v. Dunn, supra; State v. City of Tampa, supra. Obviously the courts feel that wherever the souls of men are found, there the house of God belongs."

Relator's property was undeveloped at the time the original ordinance was adopted in 1928 and is still undeveloped. According to the ordinance, the City Zoning and Planning Commission has the power in the event of property being allotted which was undeveloped at the time the ordinance was passed, and in other specific cases, to permit in a use district any use deemed by the Commission in general keeping with the uses authorized in such district subject, however, to the approval of Council.

The evidence here shows that the City Zoning and Planning Commission refused to grant a special permit or to vary the application of this use district for church purposes although it had the power to do so with the approval of the Council in consonance with the administrative provisions of the ordinance. Hence, the action of the Zoning and Planning Commission and the action of the Zoning and Planning Committee of Council had the effect of denying administrative remedies under the use district exceptions provided by the ordinance. The zoning map shows that the City has in the past deviated from the strict line of use district classifications by erecting two schools in single family or U-1 district classifications, in the case of Bayard School, about one-half mile from the site of relator's land, and Lowden School, built in another part of the City. Such action was quite proper pursuant to authority and is mentioned only to show that the City has heretofore allowed exceptions and variations for school purposes.

There is no evidence here that the use of Relator's property for temple purposes would substantially and permanently injure the appropriate use of surrounding property or lower its value, although it is claimed in the letter of the President of the City Council that residents in the area are opposed and that "off street parking space is insufficient and the adjacent dwelling would be isolated."

Certain peculiar facts appear in relation to the ordinance and the action of the city authorities relating to it for it is quite clear from the provisions concerning U-1 uses above set forth that if the applicant had applied for a permit to establish on the premises in question a farm, a nursery, a truck garden or a non-commercial greenhouse, the City, by virtue of the provisions of the ordinance, would be obligated to grant such permit since these uses are specificially allowed under Class U-1 in addition to single family dwellings. Likewise, the ordinance permits on such premises a public park, a water tower or reservoir or even a suburban or interurban railway passenger station and right of way, not including railway yards. Of course, the three latter uses are now obsolete under present day conditions but an incongruous and absurd situation is presented when the property involved is subject to all of such

uses under ordinance provisions while use for a church or temple of worship is denied.

Under such allowable provisions can it be said that a temple of worship is contrary to public morals? Can it be said that a church is contrary to public health, safety, morals or general welfare when such unusual and extraordinary uses are allowable under the ordinance? We think not.

Another fact peculiar to this case is the character of the development directly across the road from relator's property in the City of University Heights. The golf course across the road is a commercial use, part of which has been sold for school purposes. It must be conceded that the character and growth of the adjacent property in University Heights has and will continue to have a definite influence upon the character of the entire neighborhood which cannot be controlled by the authorities of South Euclid. The City, by way of brief, argues that the relator should have purchased part of the golf course in University Heights or purchased property on Warrensville Center Road on which to erect a temple rather than on their side of the road. We think this is beside the point. It is begging the question to argue that a church or temple of worship would be proper if placed across the road from relator's property but improper on respondents' side of the road.

It should be observed that the ordinance permits churches in a residential district, but classifies churches in the same category as apartment houses and other buildings, mostly public in character, such as hotels, schools, public libraries, museums, etc., as set forth hereinabove. A comparison of the zoning ordinance of South Euclid with the 1922 Zoning Ordinance of the City of Euclid indicates that it is a copy of that ordinance in most every respect. Insofar as uses U-1 to U-3 are concerned, it is in ipsissimis verbis for verification of which compare the language employed in respect to these uses with the language of the 1922 Euclid Ordinance as set forth in Euclid v. Ambler Realty Co., 272 U. S. 365, 71 L. Ed. 303, 47 Supreme Ct. Rep. 114, 54 A. L. R. page 1016. In State ex rel v. Joseph, supra, our Ohio Supreme Court, referring to the language of the Euclid v. Ambler Realty case, said in part relating to churches, at page 242:

"The Supreme Court of the United States, however, not only pointed out that it was simply validating the ordinance in its 'general scope' and not in detail, but, in addition, the court expressly removed from consideration that portion of the ordinance which restricted the use of property for church purposes, saying at page 385: '* * * there is nothing in the record to suggest that any damage results from the presence in the ordinance of those restrictions relating to churches, schools, libraries and other public and semi-public buildings * * *. For present purposes the provisions of the ordinance in respect of these uses may, therefore, be put aside as unnecessary to be considered.' The Village of Euclid case, while deciding that commercial and industrial structures may, consistently with the Fourteenth Amendment, be excluded from residential districts, decides nothing with regard to the exclusion of humanitarian, public and semi-public uses like churches, schools and libraries."

We think, also, the objection interposed with respect to traffic conditions by the Committee of Council is without substance in fact. As previously pointed out, the roadway at the location is seventy feet in width, thirty-five thereof being in the City of South Euclid and thirty-five feet in the City of University Heights, in addition to which eighty-one off-street parking spaces are provided. This proposition is well covered by the Supreme Court of Florida in State v. City of Tampa, 48 So. 2nd 78, a case where a building permit for a church had been refused on the ground that the space shown to be available for off-street parking was inadequate.

"The contenton that people congregating for religious purposes cause such congestion as to create a traffic hazard has very little in substance to support it. Religious services are normally for brief periods two or three days in the week and this at hours when traffic is lightest—early in the morning, early in the evening and at 10:00 and 11:00 on Sundays. Many churches are like this one, in residential areas, where traffic is not heavy and where there are side streets and other facilities for parking. The church involved here is a small church which is shown to have ample off-street parking space for all ordinary purposes. It would rarely, if ever, require parking space on the street in front of the church. Even if rare occasions should require parking a few cars on the streets, we cannot say that a traffic hazard would be created. This is certainly a case in which the balance of convenience rule as to range in judgment might be applied. * * * There is another reason, no doubt the primary one, why the church is not bound by some of the regulations imposed on other institutions. In American life the family is the foundation on which democratic institutions are reared. The church and the school are but auxiliaries to the family. * * * No one knew this better than the Founding Fathers. Hence we say that when the church enters the picture different considerations actuate any and all spheres of regulation. * * *"

To the same effect, with relation to traffic, are the remarks of the Court of Indiana in Board of Zoning A. v. Decatur, Ind. Co. of Jehovah's W., supra, wherein it is stated:

"It is no doubt true that automobile traffic often chokes the streets and endangers both the general and the traveling public. However, it is rarely, if ever, that people entering or leaving a church cause or contribute to traffic accidents. It would seem reasonable to assume that if regulation is necessary in the interest of the safety, convenience and welfare of the general public, that should be regulated which has a direct effect upon such general welfare. This can be, and is, done generally by traffic police, signs and other reasonable regulations imposed alike upon all persons using the streets in the vicinity of churches, without undue interference with the right of worship and free assembly."

"When under the facts in this case, the welfare and safety of the people in the neighborhood is placed in the scales of justice on one side, and the right to freedom of worship and assembly is placed on the other, the balance weighs heavily on the side guaranteeing the right to peaceful assembly and to worship God according to the dictates of conscience, regardless of faith or creed." (Emphasis added.)

The Zoning and Planning Commission asserts that it considers the six lots as too small, although an acre in total extent, upon which to erect a building of only one hundred twenty feet in length and eighty-five feet in depth. An examination of the maps and drawings in evidence shows only a comparatively small area for the erection of the building, leaving a comparatively large area for landscaping and parking purposes. Thus the claim that the area is too small has little or no substance in fact. When it is considered that these premises could be used as a matter of right for such unrelated uses as a farm, a truck garden, a nursery or a non-commercial greenhouse, which would necessarily require the use of buildings for such purposes, the action of respondents in refusing to grant a permit for a single story building to be used for congregational or temple purposes appears to be arbitrary and unreasonable.

It would appear here as stated in Noctow v. City of Cambridge, 277 U. S. 183, 187, 72 L. Ed. 842, 48 S. Ct. 447, that the action of the authorities "has no foundation in reason and is a mere arbitrary or irrational exercise of power, having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense."

Based upon the principles announced by the Supreme Court in State ex rel v. Joseph, supra, and upon the authority of the cases cited and relied on in that case and the principles and authorities announced by this Court in State ex rel v. Bruggemeier, supra, the action of the City Officials appears to be unreasonable and arbitrary.

State ex rel v. Joseph, supra, is a landmark case not only in Ohio but throughout the country, being most frequently cited and quoted with approval in authoritative decisions and in text authorities on the subject of zoning. The Supreme Court in that case states in language which we think is here applicable at page 248, et seq.:

"Of all nonresidential uses, a small suburban church would seem to present a minimum of objections. All of the same considerations which have been urged against permitting this church in a residential neighborhood, were present in a far greater degree in the case of a parochial school or an orphans' home, and yet they were held not to bear a sufficiently substantial relation to the public health, safety, morals or general welfare to warrant the exclusion of these institutions. (Citing cases * * *) It must therefore be concluded that respondents' supporting reasons for the attempted exclusion of the church cannot be justified on the score of the protection of public health and safety.

"How does the case stand with respect to the protection of public morals and the general welfare? The church in our American society has traditionally occupied the role of both teacher and guardian of morals. Restrictions against churches could therefore scarcely be predicated upon a purpose to protect public morals. Over the generations we have seen American churches in the quiet, dignified surroundings of residential districts readily accessible to the members of the congregation. Such churches as are now found in business sections were for the most part in residential neighborhoods when they were built, but

the commercial life of the community has gradually crept up around them. Fully to accomplish its great religious and social function, the church should be integrated into the home life of the community which it serves. Churches in fitting surroundings are an inspiration to their members and to the general public. If located in the residential district —space, perspective, greenswards and trees aid in setting off the beauty of the building and thereby increasing its inspiration. To require that churches be banished to the business district, crowded alongside filling stations and grocery stores, is clearly not to be justified on the score of promoting the general welfare.

"When brought to an exact focus, what respondents are seeking to accomplish is the creation, by an administrative act, of exclusive residential subdivisions for private individuals. It is true that many people prefer not to reside next door to a church. But the way legally to effectuate this desire is by private mutual covenants between property owners imposing appropriate servitudes on the land. We must not 'employ the new device of zoning to make exclusive districts much more exclusive,' Bassett on Zoning, page 72. We do not believe it is a proper function of government to interfere in the name of the public to exclude churches from residential districts for the purpose of securing to adjacent landowners the benefits of exclusive residential restrictions."

This Court, at page 76, in State, ex rel v. Bruggemeier, supra, stated:

"The place of the church is to be found in that part of the community where the people live. It is to be associated with the home. Its influence is concerned with family life. It is an institution to which we look for leadership in furtherance of the brotherhood of man in molding the moral progress of our children and sustaining and giving strength to purity of our family life. To hold that a church is detrimental to the welfare of the people is in direct contradiction of historical truths and evidences a failure to recognize basic fundamentals of a democratic society."

We think the logic and reasoning of these cases have equal application to the case at bar.

Our conclusion on the second question posed above is therefore twofold: First: that the provision of the ordinance as applied to relator's lands, excluding the same for church purposes, bears no relation to public health, safety, morals and general welfare and is, therefore, violative of relator's constitutional rights under Sections 1 and 19, Article I, Ohio Constitution, and the due process clause of the fourteenth amendment of the Federal Constitution. Second: that in any event, the action of the respondent city officials in refusing to issue a special permit for temple or congregational purposes under the administrative provisions of the ordinance, constitutes an abuse of discretion which is also violative of relator's constitutional rights.

Holding these views, we conclude that the writ of mandamus should be allowed to issue as prayed for. Judgment accordingly.

Exceptions. Order see journal.

KOVACHY, PJ, SKEEL, J, concur.