STATE EX REL. LAKE DRIVE BAPTIST CHURCH, Appellant, v. VILLAGE OF BAYSIDE BOARD OF TRUSTEES and another, Respondents.

*January 10—March 7, 1961.*

For the appellant there was a brief and oral argument by *Nathaniel D. Rothstein, Jack E. Keyes,* and *Paul C. Konnor,* all of Milwaukee.

For the respondents there was a brief and oral argument by *Suel O. Arnold* of Milwaukee.

A brief *amicus curia* was filed by *Joseph J. Shutkin, Irvin B. Charne, Nathan Schapiro,* and *Alvin Friedman,* all of Milwaukee, and *Leo Pfeffer* of New York City, and *Joseph Minsky* of Chicago, Illinois, of counsel.

FAIRCHILD, J. 1. *Statutory authority of village to zone with respect to churches.*[1] Zoning power is conferred on cities and villages by sec. 62.23 (7), Stats., made applicable to villages by sec. 61.35. It includes the power to regulate the "location and use of buildings, structures, and land for trade, industry, residence, or other purposes." The supreme court of Missouri has held that, under the rule of *ejusdem generis,* the same words in the statutes of that state do not convey authority to control the location of schools or other public buildings or churches.[2] We are asked to follow that court, but decline to do so. We are satisfied that zoning ordinances in this state ordinarily do regulate the use of land for many purposes not similar to trade, industry, and residence use. We have treated private schools[3] and bible camps[4] as subject to city zoning power, and considered a county jail as not so subject because of special statutes governing its location.[5]

2. *Constitutionality of a zoning ordinance which excludes a church from a district where dwellings are permitted.* With respect to use of land in residence districts for a church, zoning ordinances fall into three types: (1) Permitting

---

[1] The word "church" is used in this opinion as including a place of worship of any faith.

[2] *Congregation Temple Israel v. Creve Coeur* (Mo. 1959), 320 S. W. (2d) 451, 454.

[3] *State ex rel. Wisconsin Lutheran H. S. Conference v. Sinar* (1954), 267 Wis. 91, 65 N. W. (2d) 43.

[4] *State ex rel. Covenant Harbor Bible Camp v. Steinke* (1959), 7 Wis. (2d) 275, 96 N. W. (2d) 356.

[5] *Green County v. Monroe* (1958), 3 Wis. (2d) 196, 87 N. W. (2d) 827.

churches in all; (2) permitting a church only upon special permit, after hearing; and (3) excluding churches, often, if not usually from districts where residential use is itself restricted to certain types of dwellings.[6]

It appears that most zoning ordinances fall into the first two types.[7] The first presents no constitutional problem. Many of the cases on this subject arise from denials of permits under the second type of ordinance. Standards in ordinances of the second type appear to be vaguely defined or omitted, and that fact has given rise to some difficulty. A practical advantage of this method is that it permits administrative determination on a case-by-case basis of the suitability of particular sites for church use. We are urged to decide the matter before us on the principle that only the first, or possibly the second type of ordinance is valid. Several courts, in considering whether to set aside a denial of a permit under an ordinance of the second type, have said that an ordinance of the third type would be invalid.[8]

---

[6] *Milwaukie Co. of Jehovah's Witnesses v. Mullen* (1958), 214 Or. 281, 330 Pac. (2d) 5, 74 A. L. R. (2d) 347.

[7] "Regulation of the Location of Churches by Municipal Zoning Ordinances" (1956–1957), 23 Brooklyn Law Review, 185, 186.

[8] "The law is well settled that the building of a church may not be prohibited in a residential district." Dictum in *Board of Zoning Appeals v. Decatur, Indiana Co. of Jehovah's Witnesses* (1954), 233 Ind. 83, 91, 117 N. E. (2d) 115, 119.

"It is well established in this country that a zoning ordinance may not *wholly exclude* a church or synagogue from any residential district. Such a provision is stricken on the ground that it bears no substantial relation to the public health, safety, morals, peace, or general welfare of the community." Dictum in *Diocese of Rochester v. Planning Board* (1956), 1 N. Y. (2d) 508, 522, 136 N. E. (2d) 827, 834.

"Since a city cannot legally exclude a church from a residential district by a zoning ordinance, it cannot legally accomplish the same result by denying permits unless the reasons for refusing the permits are based on valid evidence showing that to permit a church would be detrimental to the health, the safety, the morals or the

The supreme court of Texas had an ordinance of the third type before it, and held it invalid.[9]

The supreme court of Florida held a similar ordinance valid.[10] The court noted that the church bought the property with knowledge of the zoning restrictions; there were sites available in districts where churches would be permitted; church use would cause the value of the surrounding property to depreciate, and give rise to a genuine traffic problem. The court also pointed out that churches are now customarily used for many activities besides worship services and prayer meetings.

A California court of appeal held an ordinance of the third type valid. The court noted that the record did not

general welfare of the community." *Congregation Committee, North Fort Worth Congregation, Jehovah's Witnesses v. Haltom City* (Tex. Civ. App. 1956), 287 S. W. (2d) 700, 704.

"We seriously question the constitutionality of any enactment that seeks flatly to prohibit the erection of churches in residential districts." *State ex rel. Synod of Ohio v. Joseph* (1942), 139 Ohio St. 229, 240, 39 N. E. (2d) 515, 520.

This court citing the foregoing Ohio case has said:

"The majority of courts, on constitutional grounds, refuse to uphold the exclusion of churches by zoning. Appellants' argument as to the value of religious institutions to society might be well advanced if we had a zoning ordinance before us." *Hall v. Church of the Open Bible* (1958), 4 Wis. (2d) 246, 249, 89 N. W. (2d) 798.

See Bassett, Zoning (1936 ed.), p. 200; 2 Metzenbaum, Zoning (2d ed.), pp. 1461–1464; 2 Yokley, Zoning Law and Practice (2d ed.), pp. 110–112, sec. 222.

See Anno. Zoning Regulations—Churches, 74 A. L. R. (2d) 377.

[9] In *Sherman v. Simms* (1944), 143 Tex. 115, 119, 183 S. W. (2d) 415, 417, the court said: "To exclude churches from residential districts does not promote the health, the safety, the morals or the general welfare of the community, and to relegate them to business and manufacturing districts could conceivably result in imposing a burden upon the free right to worship and, in some instances, in prohibiting altogether the exercise of that right. An ordinance fraught with that danger will not be enforced."

[10] *Miami Beach United Lutheran Church v. Miami Beach* (Fla. 1955), 82 So. (2d) 880.

indicate that the church could not be built in a district where churches would be permitted.[11] The following reference to that decision was made by the supreme court of the United States:

"When the effect of a statute or ordinance upon the exercise of First-amendment freedoms is relatively small and the public interest to be protected is substantial, it is obvious that a rigid test requiring a showing of imminent danger to the security of the nation is an absurdity. We recently dismissed for want of substantiality an appeal in which a church group contended that its First-amendment rights were violated by a municipal zoning ordinance preventing the building of churches in certain residential areas." [12]

Most of the decisions on this subject appear to involve denials of a special permit to build a church under the second type of ordinance. In a number, the denial has been set aside, sometimes with an accompanying statement that there is no valid basis for exclusion.[13]

In a few cases, denials under the second type of ordinance have been upheld.[14]

[11] *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Porterville* (Cal. 1949), 338 U. S. 805, 70 Sup. Ct. 78, 94 L. Ed. 487. (Appeal dismissed.)

[12] *American Communications Asso. v. Douds* (1950), 339 U. S. 382, 397, 70 Sup. Ct. 674, 94 L. Ed. 925.

[13] *Board of Zoning Appeals v. Decatur, Indiana Co. of Jehovah's Witnesses* (1954), 233 Ind. 83, 117 N. E. (2d) 115; *Community Synagogue v. Bates* (1956), 1 N. Y. (2d) 445, 154 N. Y. Supp. (2d) 15, 136 N. E. (2d) 488; *Diocese of Rochester v. Planning Board* (1956), 1 N. Y. (2d) 508, 154 N. Y. Supp. (2d) 849, 136 N. E. (2d) 827; *State ex rel. Anshe Chesed Congregation v. Bruggemeier* (1953), 97 Ohio App. 67, 115 N. E. (2d) 65; *Young Israel Organization v. Dworkin* (1956), 105 Ohio App. 89, 133 N. E. (2d) 174.

[14] *Milwaukie Co. of Jehovah's Witnesses v. Mullen* (1958), 214 Or. 281, 330 Pac. (2d) 5, 74 A. L. R. (2d) 347 (denial based on traffic congestion); *Galfas v. Ailor* (1950), 81 Ga. App. 13, 57 S. E. (2d) 834 (denial based on traffic problem); *West Hartford Methodist Church v. Zoning Board of Appeals* (1956), 143 Conn.

It is clear enough that a church has some attributes which tend to make it less desirable to its next-door neighbor than a one-family dwelling. It entails substantial gatherings of people, resulting disturbance, and the problem of parking automobiles. In a case where we permitted enforcement of a private covenant preventing the use of property for a church, we said:

"Conceding the social value of churches, it is nevertheless true that churches, like other places of assembly, produce noise, congestion, and traffic hazards. The exclusion of uses which create such conditions in an area planned as residential cannot be said to be against public policy." [15]

This court has recognized that the protection of property values is an objective upon which a zoning ordinance may be grounded.[16] In the same decision, it referred to the general rule that zoning power may not be exercised for purely aesthetic considerations, but suggested great doubt whether this rule is still the law.[17] Whether restriction of use of a

263, 121 Atl. (2d) 640 (denial based on substantial injury to surrounding homes).

[15] *Hall v. Church of the Open Bible* (1958), 4 Wis. (2d) 246, 249, 89 N. W. (2d) 798.

[16] *State ex rel. Saveland Park Holding Corp. v. Wieland* (1955), 269 Wis. 262, 270, 69 N. W. (2d) 217.

[17] The court quotes from *Berman v. Parker* (1954), 348 U. S. 26, 33, 75 Sup. Ct. 98, 99 L. Ed. 27, as follows:

"The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc., v. Missouri,* 342 U. S. 421, 424 [72 Sup. Ct. 405, 407, 96 L. Ed. 469]. The values it represents are spiritual as well as physical, *aesthetic as well as monetary.* It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well balanced as well as carefully patrolled. In the present case, the congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. *If those who govern the District of Columbia decide that the nation's capital should be beautiful as well as sanitary, there is nothing in the Fifth amendment that stands in the way."* (Emphasis supplied.)

district to strictly residential uses will protect property values is the type of question upon which the decision of the municipal board is accepted unless shown to be unreasonable.

A church, however, is not to be viewed merely as the owner of property complaining against a restriction on its use. It may also challenge an ordinance as an unwarranted burden upon, or interference with, the freedom of the adherents of the church to worship after the manner of their faith. We are familiar with the constitutional protection of freedom of religion from governmental interference.[18]

An ordinance which excludes a church from a particular district must pass two tests:

(1) Can it reasonably be said that use for a church would have such an effect on the area that exclusion of such use will promote the general welfare, and

(2) Does the exclusion impose a burden upon freedom of worship which is not commensurate with the promotion of general welfare secured?

The United States supreme court has said of religious freedom, protected by the First amendment:

"Thus the amendment embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom."[19]

The test is whether a regulation is an *undue infringement*. Any restriction upon the opportunity to build a house of worship is at least a potential burden upon the freedom of

[18] Art. I, and sec. 1, art. XIV, amendments to constitution of United States, art. I, Wis. Const.

[19] *Cantwell v. Connecticut* (1940), 310 U. S. 296, 303, 60 Sup. Ct. 900, 84 L. Ed. 1213.

those who would like to worship there. Whether the burden is slight or substantial will depend upon circumstances. In a community where adequate and accessible building sites are available in all districts, it might be a negligible burden to exclude churches from some of them. There must be many circumstances under which a religious group could demonstrate that an exclusion from a particular area would be a substantial burden.

The Bayside ordinance, since 1956, has excluded churches from "A," "B," and "C" districts, where one-family dwellings are permitted, has permitted dwellings, churches, and other institutions in several "E" districts, and has confined "D" districts to dwellings and certain business uses. We conclude that the exclusion of churches, of itself, does not render the ordinance invalid. To determine invalidity would require determination that the "E" districts do not afford reasonably suitable, accessible, and available sites as compared with those in other districts. While there was testimony questioning the suitability of sites in the "E" districts, and the court found that some of the land was overpriced, we do not find it necessary, in this case, to decide whether, as to a church first coming upon the scene after passage of the 1956 amendment, the exclusion of churches from all but "E" districts was an undue burden.

3. *Invalidity with respect to "C" districts.* The Bayside ordinance permits schools and municipal buildings in "C" districts, but excludes churches. Permitted schools are not limited to public schools. Some, at least, of the attributes of a church which annoy neighbors, are also characteristic of schools. It is at least arguable that it is arbitrary and capricious to exclude churches while permitting schools. Exclusion of churches has been held invalid where an ordinance permitted dwellings, schools, colleges, public libraries, public museums and art galleries, parks, etc., and farms and green-

houses [20] and where an ordinance permitted homes, municipal buildings, railroad stations, public schools, and clubhouses.[21] This court has upheld exclusion of private and parochial high schools from a district where public high schools are permitted,[22] but considered it necessary to point out that while all high schools would present detrimental effects, public high schools presented certain advantages which the zoning authority could have considered compensating. In any event, little attention has been given to this issue in the briefs of the parties here, and we do not decide it.

4. *Invalidity of ordinance before 1956.* We are not aware what zoning restrictions were in effect in Bayside before July, 1954. It was in the first half of 1954 that the village board first indicated that it would agree to construction of a church on plaintiff's site. In June of 1954, plaintiff was incorporated, apparently choosing its name with the expectation that it would build at the proposed site. The ordinance adopted in July, 1954, appears to exclude churches from the entire village. We do not hesitate to say that the ordinance in that form was invalid.[23] From July, 1954, to November, 1956, it would have been lawful to build a church anywhere in the village. It was during this period that plaintiff accepted from Dr. Davis the six lots it now owns, and

---

[20] *Ellsworth v. Gercke* (1945), 62 Ariz. 198, 156 Pac. (2d) 242.
[21] *North Shore Unitarian Society v. Plandome* (1951), 200 Misc. 524, 109 N. Y. Supp. (2d) 803.
[22] *State ex rel. Wisconsin Lutheran H. S. Conference v. Sinar* (1954), 267 Wis. 91, 65 N. W. (2d) 43.
[23] *Mooney v. Orchard Lake* (1952), 333 Mich. 389, 53 N. W. (2d) 308; *North Shore Unitarian Society v. Plandome* (1951), 200 Misc. 524, 109 N. Y. Supp. (2d) 803. See statements pointing out that an ordinance held valid did not completely exclude churches in *Milwaukie Co. of Jehovah's Witnesses v. Mullen* (1958), 214 Or. 281, 330 Pac. (2d) 5, 74 A. L. R. (2d) 347; and *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Porterville* (Cal. 1949), 338 U. S. 805, 70 Sup. Ct. 78, 94 L. Ed. 487.

presented its first proposed plans. Although the plans were disapproved, disapproval was based on the type of structure proposed, and not on the use of the land for a church.

5. *Presumption of validity.* "Under well-established rules, where a municipal body enacts regulations pursuant to authority expressly granted, all presumptions are in favor of its validity, and any person attacking it must make the fact of its invalidity clearly appear."[24] Cases like the present, however, raise not only the questions usually raised by restriction upon an owner's right to use his property, but the additional question of whether religious freedom is being unduly impaired. We conclude that it is the duty of a court to give the closest scrutiny to the question whether the exclusion of a church from a district is justified.

The supreme court of Oregon has commented critically on a tendency "to cloak petitioning churches with a species of judicial favoritism under the zoning laws."[25] It seems to us that the courts must be sensitive to any claim that an undue burden is put upon freedom of worship. This is true both because of the importance of this freedom, and because of the real possibility that an overgenerous reliance upon the presumption of validity may cloak discriminatory action against a religious group which is too small a minority in the community to have an effective voice.

6. *Vested rights.* Plaintiff argues that its action in reliance upon favorable intimations of the village board gave it a property right to construct a church on its site, or estopped the village board from preventing it. Counsel cites *Rosenberg v. Whitefish Bay* (1929), 199 Wis. 214, 225 N. W. 838, and subsequent decisions. Plaintiff accepted the land (as a gift), chose its name, and prepared its first plans after the

---

[24] *State ex rel. Newman v. Pagels* (1933), 212 Wis. 475, 479, 250 N. W. 430.

[25] *Milwaukie Co. of Jehovah's Witnesses v. Mullen* (1958), 214 Or. 281, 316, 330 Pac. (2d) 5, 74 A. L. R. (2d) 347, 369.

board manifested a favorable attitude and before the 1956 amendment. The record does not disclose the extent of any expenditure during that period, and we do not find that the principle of the *Rosenberg Case* is applicable.

7. *Arbitrary action of the board.* As we have heretofore noted, the Bayside ordinance of 1954 excluded churches from the village, and therefore could not have prevented plaintiff from building on its site. Assuming that the 1956 amendment, by providing that churches might be erected in certain districts, made valid the parts of the ordinance excluding churches from other districts, was it arbitrary and capricious not to include plaintiff's site in a district where plaintiff could proceed with its building? While plaintiff's prior relationship with the village board and its various activities in reliance thereon are insufficient to give plaintiff a so-called "vested" right to build, they do provide strong equitable considerations for favorable zoning if at all reasonable.

In reaching the conclusion that the action of the village board was arbitrary and capricious, we have been persuaded by the following propositions: (a) Plaintiff is entitled to the benefit of equitable considerations arising out of its actions in reliance on the board's indication of agreement. (b) The board rejected not only its own original view, but the recommendation of the consultant it employed, and the repeated recommendation of the village plan commission. (c) It appears that the property is better suited for a church than for residences. (d) Any traffic hazard could be readily eliminated by the village. (e) The fact that other owners combined their lots in Pelham Heath has little significance.

8. *Suitability of site, and effect on other lots.* A Mr. Wahlberg testified that he was a lawyer and real-estate broker with twenty years' experience; that he specialized as a broker in land subdivision and development, and had, in the past, developed land in the village of Bayside; that he had

purchased lots in all three Pelham Heath subdivisions start-
ing in 1954, and had purchased about 110 individual lots.
At the time of the trial, he owned 15 out of the 76 lots in
Pelham Heath No. 2, 35 out of the 131 lots in Pelham
Heath, and 38 out of 80 lots in Pelham Heath No. 3. He
testified that in Pelham Heath No. 2 there were eight resi-
dences in existence or under construction, 22 in Pelham
Heath, and five in Pelham Heath No. 3. The average
market value of these homes was from $30,000 to $35,000,
including land and buildings. It was his opinion that the
church lots are not suited for residential use because of
proximity to the Saxony restaurant, and the flow of traffic
on the highway, and the difficulty of ingress and egress from
a residence on these lots fronting the highway. With specific
reference to the church construction as proposed by plaintiff,
it was his opinion that it would have no adverse effect on
other lots or improvements in the Pelham Heath subdivi-
sions. As an owner of land in the area, he would have no
objection to the construction of the church, and would, in
fact, favor it, because the lots were not usable as residential
lots, and would be adaptable for a well-designed church with
offstreet parking and setbacks; that the construction of a
church would make other lots generally more salable.

On cross-examination, he qualified his testimony with
respect to the lots immediately adjacent and directly across
the street from the church parking lot which would be ad-
versely affected by the type of traffic which would use it.

9. *Traffic hazard.* The church parking lot would be
reached from North Fielding. The greater part of the antici-
pated traffic would enter North Fielding from East Brown
Deer road, and would enter East Brown Deer road at that
intersection after leaving the church. An experienced traffic
engineer made a study of the traffic problems at the site, in-
cluding traffic counts at appropriate times, and the effect of

the proposed building on visibility at the curve. It was his opinion that there would be no traffic hazard developing from the amount of traffic generated by the church, and that it would not be necessary to have an officer stationed at the intersection during church hours. The village chief of police testified that it would be a hazard, but it could be eliminated by a stop-and-go light, or stationing an officer.

10. *Combining of lots.* When the Pelham Heath subdivisions were annexed, they contained small lots (40, 45, and 50-foot widths), and there were no improvements. Some of the owners requested improvement of the lots, and installation of a sewer system. The village board then agreed to furnish a sewer system and improve the streets provided the owners would combine their property so that the minimum width for any building site and sewer connection would be 85 feet, and preferably so that the minimum width would be more than 100 feet. Committees of volunteers were formed to obtain covenants. These covenants read that,

"The owner hereby agrees to consolidate and use his two (2) adjoining lots for the express purpose of creating a single one (1) family residential building site to which there shall be but one (1) sewer connection from any sewer hereafter constructed by the village of Bayside.

"The owner further agrees that consolidation of adjoining lots for the express purpose of creating a single one (1) family residential site will greatly lessen fire hazard, alleviate a water shortage and will improve health, safety, and welfare with regard to sewage disposal."

It was apparently the theory of the majority of the village board, and the circuit court agreed, that it would be inequitable to zone the church property for institutional use after 75 per cent of the lots in the Pelham Heath subdivisions had signed the consolidation agreements. This is difficult for us to follow, because it does not appear with any clarity that

in 1955, when these agreements were signed, there was any representation that would morally obligate the village not to change the zoning in the Pelham Heath subdivisions. This matter does not have much weight in any event, because the church had some equitable considerations in its favor as pointed out above.

The plaintiff acquired its land for church purposes with the knowledge of the village board at a time when the ordinance could not have been enforced against use of the land for church purposes. We conclude that it is inequitable to enforce the ordinance against plaintiff, the board having arbitrarily omitted plaintiff's land from the new "E" districts created in 1956.

*By the Court.*—Judgment reversed, cause remanded with directions to enjoin enforcement of the Bayside zoning ordinance against construction of a church on plaintiff's site, and to issue a peremptory writ of mandamus commanding the building inspector to issue the building permit applied for.

HALLOWS, J. (*concurring*). I concur with the result of the court's opinion and much of its reasoning. However, I would reverse also on the ground the exclusion of churches from residential districts is invalid and particularly the exclusion of churches from the "C" district which permits schools and municipal buildings as well as residences is invalid because such classification is arbitrary, unreasonable, and capricious.

The court's opinion points out the total exclusion of churches from the village would be invalid but implies the exclusion of churches from "A," "B," and "C" districts under the ordinance is valid if there are other areas or districts in Bayside which contain adequate and available sites and in which churches are permitted. The validity of an

ordinance excluding churches from residential areas is thus to be determined by the circumstances of each case.

Considering the nature of the zoning power of a municipality, I cannot agree the exercise of that power to exclude churches of itself does not render an ordinance invalid. The zoning power may only be exercised to promote the health, safety, morals, and general welfare of the community. See sec. 62.23 (7) (a), Stats., cities, and sec. 61.35, villages. The exclusion of churches from a residential district as was done in this case, must bear some reasonable relationship to the promotion of those ends. Because it may be contemplated that a church might be undesirable or affect the safety or the general welfare of the community, that fact does not justify the universal exclusion of all churches from the district. Correct thinking does not permit the drawing of a universal conclusion from an isolated fact.

The majority rule in this country is that churches may not, either by the express or implied language of the zoning ordinance, validly be excluded from residential areas as an absolute and an invariable rule. The following cases so hold or state.[1] We pointed out this rule in *Hall v. Church of the Open Bible* (1958), 4 Wis. (2d) 246, 249, 89 N. W. (2d) 798.

---

[1] *Pentecostal Holiness Church v. Dunn* (1946), 248 Ala. 314, 27 So. (2d) 561; *Ellsworth v. Gercke* (1945), 62 Ariz. 198, 156 Pac. (2d) 242; *O'Brien v. Chicago* (1952), 347 Ill. App. 45, 105 N. E. (2d) 917; *Board of Zoning Appeals v. Decatur, Indiana Co. of Jehovah's Witnesses* (1954), 233 Ind. 83, 117 N. E. (2d) 115; *Attorney General v. Dover* (1951), 327 Mass. 601, 100 N. E. (2d) 1; *Portage Township v. Full Salvation Union* (1947), 318 Mich. 693, 29 N. W. (2d) 297; *Congregation Temple Israel v. Creve Coeur* (Mo. 1959), 320 S. W. (2d) 451; *State ex rel. Westminster Presbyterian Church v. Edgecomb* (1922), 108 Neb. 859, 189 N. W. 617; *State ex rel. Roman Catholic Bishop v. Hill* (1939), 59 Nev. 231, 90 Pac. (2d) 217; *Yanow v. Seven Oaks Park* (1953), 11 N. J. 341, 94 Atl. (2d) 482; *Community Synagogue v. Bates* (1956),

The exclusion of churches from residential districts has no substantial relationship to the promotion of public health, safety, morals, or general welfare. The various factors considered in excluding churches from a residential area or in determining the priority of granting or refusing a permit under those types of ordinances which permit churches in an area only by permit have been the subject matter of numerous cases. These factors, including traffic problems, traffic conditions, and effect of depreciating property values, loss of tax revenue, noise and other inconveniences, and that churches are detrimental and do not further public morals, have been considered and rejected in the previously cited cases. Invalidity of the absolute exclusion of churches from residential areas has generally been placed on constitutional grounds, such as violation of the due-process or equal-protection clauses of state constitutions and the federal constitution and as an unreasonable interference with the freedom of religion.

The church in our society has long been identified with family and residential life. Churches traditionally have been and should be located in that part of the community where people live. They should be easily and conveniently located

1 N. Y. (2d) 445, 154 N. Y. Supp. (2d) 15, 136 N. E. (2d) 488; *Diocese of Rochester v. Planning Board* (1956), 1 N. Y. (2d) 508, 154 N. Y. Supp. (2d) 849, 136 N. E. (2d) 827; *State ex rel. Synod of Ohio v. Joseph* (1942), 139 Ohio St. 229, 39 N. E. (2d) 515; *State ex rel. Anshe Chesed Congregation v. Bruggemeier* (1953), 97 Ohio App. 67, 115 N. E. (2d) 65; *Young Israel Organization v. Dworkin* (1956), 105 Ohio App. 89, 133 N. E. (2d) 174; *Milwaukie Co. of Jehovah's Witnesses v. Mullen* (1958), 214 Or. 281, 330 Pac. (2d) 5; *Stark's Appeal* (1950), 72 Pa. D & C 168, 98 Pittsburgh Legal Journal, 361; *Sherman v. Simms* (1944), 143 Tex. 115, 183 S. W. (2d) 415; *State ex rel. Wenatchee Congregation of Jehovah's Witnesses v. Wenatchee* (1957), 50 Wash. (2d) 378, 312 Pac. (2d) 195; *State ex rel. Howell v. Meador* (1930), 109 W. Va. 368, 154 S. E. 876. Bassett, Zoning (1940 ed.), p. 200; 2 Yokley, Zoning Law & Practice (2d ed.), p. 110, sec. 222. See also Annos. 138 A. L. R. 1287, and 74 A. L. R. (2d) 347.

to the home. Churches are not supermarkets, manufacturing plants, or commercial establishments and should not be restricted to such areas. How can the exclusion of churches from a residential area promote public morals or the general welfare? To so hold is a failure to understand the purpose and the influence of churches. As quoted in *Young Israel Organization v. Dworkin* (1956), 105 Ohio App. 89, 104, 133 N. E. (2d) 174:

" 'The place of the church is to be found in that part of the community where the people live. It is to be associated with the home. Its influence is concerned with family life. It is an institution to which we look for leadership in furtherance of the brotherhood of man, in molding the moral progress of our children and sustaining and giving strength to purity of our family life. To hold that a church is detrimental to the welfare of the people is in direct contradiction of historical truths and evidences a failure to recognize basic fundamentals of a democratic society.' "

If municipalities, under the guise of general welfare, can exclude churches by the zoning process from a residential district, it follows that by the exercise of that power, a municipality can rezone a residential district making all the churches now located therein nonconforming uses, and eventually relegate churches to commercial and industrial districts. It is no answer to say that municipalities would not do this. We are not speaking of what a municipality will or will not do but what, in the exercise of the zoning power, it can do. There are limits to the exercise of the zoning power beyond which the government cannot go. There are as many people who desire to live close to a church and who believe a church in a residential district enhances the value of property as there are those who consider that a church in their midst has some depreciating effect on the value of their property. Traffic conditions, noise, and inconvenience in our modern society we will always have with

us. The solution of such problems lies in reasonable regulation, not in prohibiting churches in residential districts and changing the mode of life of the people in the community. I cannot see how excluding churches from a residential district promotes public safety, health, morals, or the general welfare or is a valid exercise of the police power.

Specifically, district "C," which allows municipal buildings, schools, and dwellings, is an invalid classification in this case, being an arbitrary, unreasonable, and capricious exercise of the zoning power. The church in question is in a "C" district. The considerations that allow municipal buildings and schools in this district would necessarily require the inclusion of churches. As the majority opinion points out, such classification has been held to be invalid and capricious.

It is true, in *State ex rel. Wisconsin Lutheran H. S. Conference v. Sinar* (1954), 267 Wis. 91, 65 N. W. (2d) 43, we held an ordinance which excluded private high schools from a classification which included public schools was a valid classification. The arguments and the reasoning of the dissenting opinion in the *Sinar Case* appeal to this writer as being valid. Perhaps the *Sinar Case* can be distinguished in that it dealt with schools and not churches, but that is of little consequence because I do not see the validity of the distinction between a public school and a private school in the same land-use district. A year after the *Sinar Case* was decided, a California court came to the opposite conclusion in holding a zoning ordinance could not exclude a private elementary school from an area where public schools were permitted. *Roman Catholic Welfare Corp. of San Francisco v. Piedmont* (1955), 45 Cal. (2d) 325, 289 Pac. (2d) 439. Many churches conduct elementary schools as a part of their activities and such schools should not be separated on any theory of land use or zoning from the church. For cases on this problem, see 36 A. L. R. (2d) 653.

There are many cases which could be cited and discussed but this opinion is not intended to be a discussion of the cases and of the reasons for the conclusions reached, but merely to express generally the position of the writer on the problems involved.

I am authorized to state that Mr. Justice BROADFOOT and Mr. Justice DIETERICH concur in this opinion.

CURRIE, J. (*dissenting*). I am in full accord with the holding of the opinion of the court written by Mr. Justice FAIRCHILD that zoning ordinances which exclude churches from residence districts do not violate the First amendment of the United States constitution as incorporated into the Fourteenth amendment, if suitable and sufficient locations for churches are provided in other use districts.

It is common knowledge that churches located in residence areas engender traffic congestion, and that such traffic congestion poses a particular hazard to small children residing in the neighborhood. It is a further matter of common knowledge that such traffic congestion, and the parking of large numbers of vehicles in the vicinity of churches, at times when people congregate there, tends to depreciate the value of surrounding residence property. All of these factors afford a reasonable basis for the exercise of a municipality's police power in order to promote the public welfare in enacting zoning ordinances of the character of the one before us in the instant case.

The fact, that schools may be permitted in a residence district while churches are excluded, does not make a zoning ordinance void on the ground that such classification offends the equal-protection-of-the-laws clause of the Fourteenth amendment. This is because of the desirability of having schools within walking distance of the homes of the majority of children who attend. This is not so essential in the case

of churches and often they are not so conveniently located. If there is any reasonable basis for a legislative classification the courts must uphold the same.

However, I must respectfully dissent from the holding of the opinion of the court that the zoning of the particular tract of land owned by the relator was arbitrary and capricious. The learned trial court in a very well-considered memorandum opinion determined that relator had obtained no vested rights prior to the adoption of the zoning ordinance under attack of November 16, 1956, and the court's opinion also adopts such view. Therefore, the village board was not precluded by anything which had occurred prior to the passage of such ordinance from failing to include the relator's property in the newly created "E" districts in which churches were permitted.

This is not a case of the adoption of an amendment to a zoning ordinance which only affected the relator's property commonly referred to as "spot" zoning. Instead the ordinance was general in scope and created several "E" districts in the village. However, the court's opinion seems to apply the principles of law applicable to "spot" zoning to arrive at the result that the zoning ordinance of November 16, 1956, was arbitrary and capricious in its application to relator's property.

Where to draw the line between various use districts provided for in a zoning ordinance is ordinarily a legislative function of the body enacting the ordinance, and the courts will not substitute their judgment for that of such body. This court stated in the zoning ordinance case of *Eggebeen v. Sonnenburg* (1941), 239 Wis. 213, 219, 1 N. W. (2d) 84:

"As long as the common council acted within the bounds of the legislative field, its discretion is controlling. A court cannot substitute its opinion for that of the legislative body.

*Geisenfeld v. Shorewood, supra* [232 Wis. 410, 415, 287 N. W. 683] ; Metzenbaum, The Law of Zoning, p. 77."

The Florida supreme court pointed out in the recent case of *Miami Beach v. Hogan* (Fla. 1953), 63 So. (2d) 493, that a line must be drawn somewhere between different use districts by a zoning ordinance, and that a court will not substitute its own determination for that of the legislative body in drawing such line.

There is no question but that the relator's property is entirely suitable for the uses permitted in Class "C" districts. In fact, there was no showing made that its value would be so adversely affected by being so zoned to such an extent as would amount to the taking of such property without due process of law. Merely because the planning expert engaged by the city and the planning commission recommended the creation of an additional "E" district to include relator's property did not require the village board to do so, nor did they render such board's action arbitrary and capricious in failing so to do.

Inasmuch as the avoidance of traffic congestion in residence areas, and protection against depreciation of surrounding property values, are a sufficient basis to support the exercise of the police power to exclude churches from residence-use districts, it is not proper for a court to second-guess the municipal legislative body as to whether a church to be built in some particular location in a residence-use district would produce such harmful results. Therefore, in the instant case it is entirely immaterial what motives prompted the majority of the village board to vote not to include relator's property in a class "E" district so long as the motive was not to discriminate against a church as such.

5 McQuillin, Mun. Corp. (3d ed.), p. 322, sec. 16.90, states the applicable general rule to be :

"Therefore, neither the motives of the members of a municipal legislative body nor the influences under which they act can be shown to nullify an ordinance duly passed in legal form, within the scope of their powers."

Because of the possibility of zoning ordinances being used to discriminate against minority religious groups, an exception to the above rule probably ought to be invoked to ascertain if the enactment of a particular zoning ordinance has such a motivation. When after inquiring into such issue it becomes apparent that the motives of the legislative body in enacting the ordinance were not to achieve such discriminatory objective, a court should not carry the inquiry further. For example, if the majority of the instant village board were motivated by a belief in the likelihood of undue traffic hazards being produced by a church located on relator's property, this is the type of motive with which courts should not concern themselves. Certainly the court should not invalidate the ordinance because the stationing of a traffic officer there at certain hours on Sunday, or the installation of traffic lights, would obviate the anticipated traffic hazard.

The trial court's memorandum opinion, findings of fact, and conclusions of law, make it clear that the trial court found that the village board's action did not discriminate against the relator's property on grounds of religion. Such finding is not against the great weight and clear preponderance of the evidence, and, therefore, is conclusive upon this court.

I would affirm the judgment below.