LAKE BLUFF HOUSING PARTNERS, a Wisconsin limited partnership, Plaintiff-Respondent,

v.

CITY OF SOUTH MILWAUKEE, and Michael Vesperman, in his capacity as City Building Inspector, Defendants-Appellants.†

Court of Appeals

*No. 94–1155. Oral argument August 10, 1994.—Decided October 4, 1994.*

(Also reported in 525 N.W.2d 59.)

†Petition to review granted.

For the defendants-appellants the cause was submitted on the briefs of the *City of South Milwaukee and Michael Vesperman, in his capacity as City Building Inspector*, with *Joseph G. Murphy* of South Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *Weiss, Berzowski, Brady & Donahue*, with *Debra A. Slater* of Milwaukee.

Before Sullivan, Fine and Schudson, JJ.

SCHUDSON, J. The City of South Milwaukee and its building inspector, Michael Vesperman (the City), appeal from the trial court judgment in favor of Lake Bluff Housing Partners, granting Lake Bluff a writ of mandamus directing the City to issue a building permit. The City argues that the trial court erred in concluding that Lake Bluff had acquired vested rights in the property on which it intended to build. We conclude that the trial court correctly determined that Lake Bluff had acquired vested rights in the property. We also conclude that the trial court exercised reasonable discretion in granting mandamus to compel the City to issue a building permit to Lake Bluff.

## I. FACTUAL BACKGROUND

The essential facts relevant to resolution of this appeal are not in dispute. According to the record and the trial court findings, Lake Bluff is a Wisconsin limited partnership engaged in the business of developing rental property. In December 1992, Lake Bluff purchased a parcel of land running along the shore of Lake Michigan in the City of South Milwaukee. Lake Bluff acquired the property, intending to construct a multi-family development that would qualify for low income housing tax credits administered by the Wisconsin Housing and Economic Development Authority (WHEDA).

Since 1965, the land had been zoned C-2, a classification that allowed for construction of multi-family residential units. Before purchasing the land, Lake Bluff verified that it was zoned C-2, and that such zoning would allow for a multi family development. The controversy in this case surrounds the circumstances between the time Lake Bluff purchased the

land, and the time South Milwaukee rezoned the property and denied the building permit.

WHEDA awarded Lake Bluff a $266,903 site-specific tax credit for the project at the property. After receiving the WHEDA award of the tax credit, Lake Bluff paid WHEDA a non-refundable fee of $16,314, to reserve the credit. Lake Bluff then obtained a survey of the property at a cost of $1,150, and contracted with its architect to prepare plans for the project at a cost of $29,513. The trial court found that in order to preserve the WHEDA tax credit, Lake Bluff's project had to be built, and certificates of occupancy had to issue by December 31, 1994. Further, the trial court found that, in order for this to occur, Lake Bluff had to begin construction immediately.

In February 1993, representatives of Lake Bluff met with the mayor, city administrator, building inspector, city engineer, and district alderperson of South Milwaukee to review initial plans for the project, and to confirm that the project could proceed to the construction stage. The City confirmed that the property was in a C-2 zone that permitted a multi-family project. At that same meeting, however, the City advised Lake Bluff that in order to obtain a building permit, it would have to provide a bluff assessment establishing that the project would not cause bluff erosion. The City also advised Lake Bluff that South Milwaukee's parking requirements had changed and that Lake Bluff would have to modify its plans to meet the new requirements. As a result, Lake Bluff modified its parking plans and also commissioned a bluff erosion study costing $4,950. Further, as a result of that study, Lake Bluff modified its plans so that one of the buildings would be relocated.

Lake Bluff continued to develop its plans between February and June 1993, when, for the first time, it learned that the City was considering imposing a moratorium on the issuance of any building permits for the property because of a request from one of the property's neighbors. In a letter of April 28, 1993, the neighbor, William J. Fox, III, had requested that the land be rezoned from C-2 to R-A, a classification that would not allow for Lake Bluff's multi-family residential development. On May 6, the City referred Fox's request to its Plan Commission which, on May 24, referred the matter to the South Milwaukee City Attorney for review and comment. The Plan Commission also recommended that no building permits issue while the rezoning request was under consideration. The trial court found that Lake Bluff did not learn that the City was considering a moratorium on the issuance of any building permits for the property or a rezoning until June 22, 1993, and did not have an opportunity to participate in the May meetings of the Plan Commission or the Common Council.

On July 6, 1993, the South Milwaukee Common Council adopted a resolution, pertaining only to the Lake Bluff property, imposing a moratorium on the issuance of a building permit. The Plan Commission then considered the rezoning request at its meeting of July 12. The Plan Commission minutes of that meeting state in part:

> William Fox restated his request to rezone the land . . . from C-2 Commercial to R-A Residential. A memo from the City Attorney was read . . . in which he advised that a moratorium on the issuance of building permits for the property may be lawfully be

[sic] imposed provided it is enacted by resolution[1] and reasonably related to the consideration of the rezoning of that property. [Alderman] Tessmer questioned the legality of rezoning any property without the consent of the owner, in this case, Lake Bluff Housing Partners. [Attorney] Eli Frank, representing Lake Bluff Housing Partners, stated his clients purchased the property in good faith, fully aware of the requirements of the existing zoning. They have expanded [sic] considerable effort planning an apartment complex which complies with every aspect of the City's zoning regulations.

On August 5, 1993, the Wisconsin Department of Industry Labor and Human Relations issued its conditional approval of Lake Bluff's plans, thus enabling Lake Bluff to seek a footing and foundation building permit and then to begin construction. That same day, Lake Bluff did submit its application for the permit, but the building inspector denied the permit because of the moratorium. Two days later, Lake Bluff began a series of attempts to learn whether its application was deficient in any way, or whether the denial was based solely on the moratorium. Among other efforts, on August 7, Lake Bluff wrote to Vesperman:

> Pursuant to our application for a "Footing/Foundation" permit on Thursday, August 5, 1993, . . . it is the understanding of this office that the following additional information will be required:

---

[1] At oral argument, the South Milwaukee City Attorney advised this court of his doubts regarding the legality of the moratorium. He indicated that, in all likelihood, such a moratorium enacted by ordinance would have been lawful, but that, by resolution, it was of dubious legality.

a. the City Engineer . . . will review the drawings deposited with your office to "verify site/building grades" for conformance,

b. your office will review the drawings deposited with your office for "conformance to required set backs,"

c. two (2) additional sets of drawings are required for application, one (1) additional "State Approved" copy, plus one (1) not necessarily stamped set,

d. evidence of "DILHR Letter of Approval" dated August 5, 1993 for each building, copies of which have been sent directly to your office by DILHR via the U.S. Mail, and

e. Footing/Foundation permit for the above captioned project "has been denied" per [the moratorium] dated July 6, 1993. Any questions concerning this matter should be referred to the City Attorneys office, attention Mr. Joseph Murphy.

Should you be in disagreement with any of the contents of this letter, please notify this writer via facsimile . . . with a hard copy via U.S. mail, prior to the close of business on Monday, August 9, 1993.

The City did not respond. On August 20, Lake Bluff wrote to the City requesting a specific response that its application either: (1) would be approved, but for the moratorium; or (2) would be disapproved, even if there were not a moratorium, because of noncompliance.[2] On

_____

[2] Lake Bluff's August 20, 1993 letter to building inspector Vesperman actually included proposed alternative letters with a request that Vesperman return either one or the other by fax that day. One letter read:

August 24, the city attorney replied to the August 20 letter, writing, in part:

> Please be advised that Mr. Vesperman has not yet reviewed the plans presented for the structural aspects of the property, has not verified the set-backs and zoning compliance and erosion control measures contemplated and the City Engineer has not had the opportunity to check the grading and zoning compliance. Furthermore, the Building Board of Review has not yet reviewed the plans.
>
> Also, please be advised that inasmuch as the moratorium will not allow construction of this project until after November 4, 1993, neither the City Building Inspector nor the City Engineer intends to drop everything else that they are currently engaged in to process this application for a building permit. Your application for a permit will simply have to wait its turn for the attention like everything else that is coming across their desk. If there

Please be advised that we are in receipt of your application for a building permit for the above referenced apartment complex. This letter is to advise you that everything is complete for the application of the footings and foundation building permit, and except for the fact that there is a moratorium on which will not allow me to issue a building permit for this property, I would be in a position to issue said permit.

The other letter read:

Please be advised that we are in receipt of your application for a building permit for the above referenced apartment complex. This letter is to advise you that there is a moratorium on which will not allow me to issue a building permit for this property, but even if there was not a moratorium, I could not issue you a building permit because you are missing the following items:

1.
2.
3. etc.

is some reason that their review ought to be advanced and expedited, please advise me.

Although Lake Bluff did not reply directly to the city attorney's request to be advised "if there is some reason that . . . review ought to be advanced and expedited," a Lake Bluff general partner wrote letters to the mayor of South Milwaukee on September 24 and October 7, requesting, in part, consideration "under whatever zoning category it may legally be determined to be now or in the future . . .." Despite Lake Bluff's efforts to secure a review of its plans, and despite the fact that, normally, the City processed such applications within one month of their receipt, the City did not review the plans and did not notify Lake Bluff of any deficiency in its application.

On October 7, the City held a public hearing on the rezoning request and, on November 2, 1993, the City enacted an ordinance, applicable only to the Lake Bluff property, rezoning it from C-2 to R-A.

On March 10, 1994, Lake Bluff resubmitted its application for a building permit, and also filed a complaint seeking a writ of mandamus to compel issuance of the permit. The complaint, in part, alleged:

> Lake Bluff acquired vested rights in the C-2 zoning of the Property prior to South Milwaukee's enactment of the change in the zoning for the Property.
> The change in the zoning of the Property is retroactive legislation and is unconstitutional, invalid and void.
> Lake Bluff will be substantially damaged if it is unable to begin construction of the project at the Property by April 1, 1994 because it would then be unable to physically complete the project by December 31, 1994, which is a requirement of the approval

of the income tax credit program. There is no adequate specific legal remedy for the threatened injury, and the granting of this Writ of Mandamus would not be inequitable.

In its answer filed March 16, 1994, the City, for the first time, asserted that Lake Bluff's August 5, 1993 plans failed to comply with C-2 zoning.[3]

The trial court, in its written findings of fact and conclusions of law and judgment, stated:

Only after Lake Bluff started this lawsuit, did South Milwaukee conduct the comprehensive review of Lake Bluff's application for building permit and only then did it identify any deficiencies in Lake Bluff's application. It did so at that time, in an additional effort to stop Lake Bluff's proposed development at the Property.

Since the start of this lawsuit, Lake Bluff has changed its plans to correct the deficiencies belatedly identified by South Milwaukee in Lake Bluff's permit application.

---

[3] The City asserted noncompliance consisting of:

a. set-back requirements of the zoning codex

b. parking requirements of the Americans with Disabilities Act

c. proper connection to existing sewer, water and street systems for the proper collection and conveyance of storm water runoff including:

  i. a continuous easement for storm sewer

  ii. no easement had been dedicated

  iii. a portion of the planned storm sewer was improperly sized

  iv. fail to provide for a required manhole

  v. failed to provide sufficient inlets and inlet leads

d. insufficient detail was provided to determine if the plans required driveway approaches which conform to City standards

Lake Bluff would suffer significant and irreparable harm if it is not allowed to proceed with its planned construction at the Property immediately.

South Milwaukee had knowledge of Lake Bluff's proposed development at the Property and of Lake Bluff's expenditure of significant sums of money toward accomplishing its development at the Property, before South Milwaukee imposed the moratorium for building at the Property or rezone the Property.

Accordingly, the trial court rendered the following conclusions of law:

Lake Bluff acquired protected vested rights and interests in the Property by virtue of the expenditures it made for the purchase price of the Property, the payment to WHEDA to reserve the low income housing tax credits, the cost of architectural plans and specifications, the survey costs and the costs for the bluff study, all in reliance upon the zoning in existence at the Property at the time that it purchased it.

Lake Bluff acquired its vested rights before South Milwaukee's enactment of the moratorium prohibiting the issuance of building permits at the Property.

South Milwaukee's actions in denying Lake Bluff's application for a building permit were arbitrary, capricious and invalid.

Because it acquired vested rights in the existing C-2 zoning at the property, Lake Bluff is entitled to a Writ of Mandamus directing the Building Inspector to issue a permit allowing it to construct its project at the Property.

South Milwaukee is estopped from raising its belated objections to Lake Bluff's plans.

241

On April 29, 1994, the trial court granted the writ of mandamus directing the City to issue a building permit to Lake Bluff for its planned development. The City appealed.

## II. STANDARD OF REVIEW

■

"In reviewing a mandamus action, 'the action of a trial judge in either granting or denying the writ will be affirmed' unless the judge erroneously exercised discretion." *Keane v. St. Francis Hosp.*, 186 Wis. 2d 637, 645, 522 N.W.2d 517, 520 (Ct. App. 1994). We will affirm a discretionary determination of the trial court if it is:

> demonstrably . . . made and based upon the facts appearing in the record and in reliance on the appropriate and applicable law.... [A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.

*Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20 (1981). In *Neu v. Voege*, 96 Wis. 489, 71 N.W. 880 (1897), the supreme court stated the criteria governing whether a trial court will issue a writ of mandamus:

> To be sure, the granting or refusing of a writ of *mandamus* is somewhat discretionary, but when the application therefor is made by a person to enforce a clear legal right; the duty sought to be enforced is positive and plain; the applicant for the writ shows that he will be substantially damaged by nonperformance of such duty; and there is no other adequate specific legal remedy for the threatened

> injury, and no laches on the part of such applicant, and no special reasons exist rendering a resort on his part to the remedy, under the circumstances, inequitable, to refuse to issue the writ constitutes an abuse of judicial discretion.

*Id.*, 96 Wis. at 492-493, 71 N.W. at 881. In this case, the issue reduces to whether Lake Bluff had a clear legal right and whether the City had a positive and plain duty.

## III. DISCUSSION

The City argues that the propriety of mandamus in this case must be measured precisely on March 10, 1994, when Lake Bluff resubmitted an application for a building permit. The City contends that, prior to March 10, Lake Bluff never submitted an application in compliance with the C-2 zoning requirements, and that, of course, on March 10, Lake Bluff's plans did not meet the requirements of R-A zoning.[4] Therefore, the City maintains, Lake Bluff never was entitled to approval of its application. Thus, the City argues, in the absence of an application complying with zoning requirements, Lake Bluff had no clear legal right and the City certainly had no positive and plain duty to issue a permit.

Lake Bluff, on the other hand, argues that the propriety of mandamus must be measured more broadly, with consideration of all the surrounding circumstances. Lake Bluff suggests that, when we make that measurement, we should focus on the March 10 denial against the background of all that occurred both

---

[4] In effect, the City also argues that even if the application on August 5 had complied with C-2, the City had no legal obligation to act on the application, and Lake Bluff never pursued mandamus at that time or during the period of the moratorium to compel the City to do so.

before and after the initial application of August 5, 1993. Then, Lake Bluff maintains, we will see that it had acquired vested rights, and that the City improperly delayed and denied its application.

The City argues that the trial court's conclusion that Lake Bluff "acquired vested rights in the existing C-2 zoning" is erroneous because a party can only have vested rights in property, not in zoning. The City points to several cases, including *Buhler v. Racine County*, 33 Wis. 2d 137, 146 N.W.2d 403 (1966), in which the supreme court stated, "Property holders have a great interest in zoning, but . . . they acquire no vested rights against rezoning because of their reliance upon the original zoning." *Id.*, 33 Wis. 2d at 148, 146 N.W.2d at 408. Thus, the City maintains, Lake Bluff's circumstances are no different from those of many parties who purchase property with plans to develop it, but later discover that their intended plans cannot go forward because of subsequent rezoning.[5]

Lake Bluff responds that "under certain circumstances, a property owner can acquire vested rights to proceed with construction despite a change in the zoning of property," and that under the specific circumstances of this case it had acquired vested rights in the property entitling it to approval of the application. Lake Bluff maintains that, on August 5, 1993, it had the clear legal right to have its application considered, and to have it approved or disapproved under C-2 zoning. In effect, therefore, Lake Bluff contends that regardless of whether we measure from August 5, 1993, or from March 10, 1994, the City had a positive

---

[5] The cases cited by the City, however, deal with the rights of property owners to continue an existing use that has become a nonconforming use after their property has been rezoned. Thus, these authorities provide limited guidance in this case.

and plain duty to issue the permit or, at the very least, to issue the permit once Lake Bluff's plans complied with all C-2 requirements. Lake Bluff further argues that the City is estopped from ultimately denying the permit for reasons of noncompliance, given that the City failed to advise Lake Bluff of any noncompliance during the pendency of its application.

Several cases have considered whether property owners have acquired vested rights in their property such that they can continue plans or construction despite zoning changes. In the *Building Height Cases*, 181 Wis. 519, 195 N.W. 544 (1923), the supreme court considered whether property owners in three separate cases had acquired vested rights such that they should be allowed to continue construction of buildings that would exceed the height restrictions imposed by a new statute.

In the first case, a company had planned a sixteen-story office building, had erected the first eight stories, and had placed a temporary roof above them, postponing completion of the building until the extension of its business required the additional floors. Before passage of the law, the company had decided to complete five more stories, and had expended $30,000 in engineering and architect fees, and had incurred additional liabilities before the new law took effect. *Id.*, 181 Wis. at 530-531, 195 N.W. at 549. The court concluded:

> [L]ong before the passage of the act the . . . company in good faith not only resolved but actually arranged for the completion of its original plans and to that end had incurred great expense. To construe this law as applying to the . . . company's building would work great hardship, a serious invasion of vested rights, and would give to the statute a retro-

spective effect which should not be given in the absence of a plain legislative purpose.

*Id.*, 181 Wis. at 532, 195 N.W. at 549.

In the second case, the property owner had begun construction of a hotel before enactment of the law. Construction had progressed to the fourth floor before passage of the law. However, it was not until after the law's enactment that the property owner decided to add a ninth story to the building. Only after enactment of the law did the property owner apply for a building permit. *Id.*, 181 Wis. 532-533, 195 N.W. at 549-550. The supreme court concluded:

> Although it is alleged . . . that this defendant decided to add a ninth story to the building before the passage of the law, nothing whatever had been done to accomplish the purpose. Defendant had incurred no additional expense or liability and had not even obtained a permit. We can see nothing here in the nature of vested rights which are affected by the law distinct from the effect which the law has upon the rights of all other property owners.

*Id.*, 181 Wis. at 533, 195 N.W. at 549-550.

In the third case, the property owner had received a permit to erect a hotel, but had not begun actual construction of the building. The owner had, however, proceeded with the project which included erection of another building across the street from the property. The owner had engaged architects, arranged for financing, and had begun tearing down the structure on the site where the hotel was planned. Although the hotel would be less profitable if its intended height would have to be reduced in compliance with the new law, the expenditures would not be wasted. *Id.*, 181

246

Wis. at 533-534, 195 N.W. at 550. The supreme court concluded:

> These facts place this case on middle ground as compared with the other two cases. While these defendants secured a permit and commenced building operations prior to the enactment of the law, there is no allegation that they had incurred any expense which will be lost to them if the building cannot be erected to a height of more than 100 feet. True, it is alleged that they had actually commenced work on the project and had arranged for its financing. Whether these facts constitute vested rights entitled to judicial protection is much more debatable than the situation presented in the other cases already disposed of, and the question must rest for the most part a matter of individual opinion.

*Id.*, 181 Wis. at 534, 195 N.W. at 550.

■

In the *Building Height Cases*, the supreme court recognized fundamental principles that are of great significance in the determination of this case:

> A construction of a statute which gives it a retrospective effect is not favored, and this is especially true where vested rights are affected.. . .
> "Every law that takes away or impairs rights that have vested under existing law is generally unjust and may be oppressive. Hence, such laws have always been looked on with disfavor."

*Id.*, 181 Wis. at 531, 195 N.W. at 549 (citation omitted). Additionally, although one might hope for a clear standard or an exact set of criteria, the *Building Height Cases* clarify that no single factor is necessarily determinative of vested rights. As Lake Bluff has argued in this case, the words of a New York court are fitting:

247

"[T]here is no fixed formula which measures the content of all the circumstances whereby a party is said to possess 'a vested right' ". Rather, it is a term which sums up a determination that the facts of the case render it inequitable that the State impede the individual from taking certain action.

*In re the Estate of Kadin*, 163 A.D.2d 308, 309 (N.Y. App. Div. 1990).

In *Rosenberg v. Village of Whitefish Bay*, 199 Wis. 214, 225 N.W. 838 (1929), the supreme court considered an ordinance that, like the statute considered in the *Building Height Cases*, " 'is silent concerning buildings in process of erection at the time the law took effect.' " *Id.*, 199 Wis. at 217, 225 N.W. at 839 (citation omitted). Unlike the *Building Height Cases*, however, *Rosenberg* is comparable to the instant action because neither razing of an existing building nor construction of a new building had begun. *See id.*, 199 Wis. at 216-217, 225 N.W. at 839. Thus, the principles *Rosenberg* declares become all the more significant in this case where vested rights were claimed although construction had not begun:

"A construction of a statute [or ordinance] which gives it a retrospective effect is not favored, and this is especially true where vested rights are affected."

. . . [E]xpense had been incurred in the preparation of plans.. . . [T]he plans prepared and all expenses incurred by the plaintiffs will be rendered of no value if the ordinance prevents them from proceeding with the building of hotel and apartment buildings.

. . . [T]his ordinance should not be so construed as to prevent the erection of the proposed buildings where substantial rights had vested prior to the enactment of the ordinance which would be unrea-

sonably injured by such a construction because such a purpose is not made clearly to appear by the language of the ordinance itself.

*Id.* (quoting *Building Height Cases*; bracketed portion in *Rosenberg*).

*Rosenberg* has additional significance for the instant case because the court, in *Rosenberg*, granted declaratory relief to the plaintiffs giving them a right to proceed with the construction of a hotel and an apartment building according to plans prepared before the passage of a rezoning ordinance "*providing always that such buildings comply with the restrictions* contained in the deed of the property in question . . .." *Id.*, 199 Wis. at 219, 225 N.W. at 840 (emphasis added). Therefore, the existence of vested rights did not, absolutely or completely, turn on whether the plans complied with all restrictions or satisfied all prerequisites to construction. This premise became all the more clear in *State ex rel. Humble Oil & Refining Co. v. Wahner*, 25 Wis. 2d 1, 130 N.W.2d 304 (1964).

In *Humble*, the property owner seeking to build a gas station petitioned for a writ of certiorari to reverse the decision of the town board of appeals denying permission to build, and for an alternative writ of mandamus to compel the building inspector to issue a building permit. *Id.*, 25 Wis. 2d at 6, 130 N.W.2d at 307. As part of its defense, the town raised the issue of Humble's alleged failure to comply with all building permit application requirements. The supreme court rejected the town's argument, stating:

> For the first time the town argues on this appeal that Humble did not comply with all the formal filing requirements or the zoning ordinance and that, therefore, Humble is not entitled to mandamus under any circumstances. It is apparent that

the town is trying to lock the barn long after the horse has disappeared. Humble submitted a claim for the station which had been approved by the industrial commission. No evidence was produced by the town to show that any vital documents had not been filed.

Three times the board acted on a Humble petition for a permit. Any failure on the part of Humble to follow formalities was waived by the board's three denials of the Humble applications, each time made without comment or stated reasons.

*Id.*, 25 Wis. 2d at 16, 130 N.W.2d at 312 (footnote omitted). Although Lake Bluff incorrectly argues that this case is "no different" from *Humble*, the differences are less significant than the similarity: in neither case is the alleged failure to comply with zoning requirements necessarily fatal to the property owner's theory.

Thus, from *Building Heights Cases, Rosenberg*, and *Humble Oil*, the following principles emerge: (1) a property owner can have vested rights in a *planned* building before actual construction begins; (2) "retrospective effect" of an ordinance is "not favored, and this is especially true where vested rights are affected"; and (3) conceptually, vested rights can be separated from zoning compliance. That is, a court can conclude that a property owner has a vested right to build, *contingent on compliance* with previously existing restrictions.[6]

[6] Thus, in this case, consistent with this principle of *Rosenberg v. Village of Whitefish Bay*, 199 Wis. 214, 225 N.W. 838 (1929), there can be both conceptual and practical separation between the disputed vested right to proceed under C-2, and the undisputed authority of the City to require compliance with C-2. Therefore, in concluding that "South Milwaukee is estopped from raising its belated objections to Lake Bluff's plans," the trial court was not requiring the City to issue the building

Although *Rosenberg* was decided in the context of an action seeking declaratory relief, the supreme court utilized its analysis in *State ex rel. Schroedel v. Pagels*, 257 Wis. 376, 43 N.W.2d 349 (1950), a mandamus action to compel a village and its building inspector to issue a building permit. *See id.*, 25 Wis. at 382–383, 43 N.W.2d at 352. The City argues, however, that *Schroedel* is distinguishable from the instant case. In *Schroedel*, the property owner filed his action seeking mandamus two days after the denial of his permit application and before the land was rezoned, *see id.*, 257 Wis. at 379, 43 N.W.2d at 350, not months later, after the rezoning. In *Schroedel*, whether the property owner's plans conformed to the then-existing zoning was disputed, *see* 257 Wis. at 382, 43 N.W.2d at 352, whereas, in this case, Lake Bluff apparently conceded that its plans initially were not in full compliance. Finally, in *Schroedel*, the court concluded that the rezoning was unconstitutional. *See id.*, 257 Wis. at 384-385, 43 N.W.2d at 353. Here, by contrast, Lake Bluff does not argue that the rezoning, viewed in isolation

permit without regard to whether Lake Bluff's plans complied with C-2. Rather, we interpret the trial court's conclusion to mean only that the City's "belated objections" would not support its objection to mandamus under these circumstances where, the trial court found, by the time of the grant of mandamus, "Lake Bluff has changed its plans to correct the deficiencies belatedly identified by South Milwaukee."

Thus, this court's affirmance of the trial court requires the City to treat Lake Bluff's application under C-2 zoning. This affirmance does not, however, strip the City of authority to monitor construction in order to enforce C-2 compliance. Accordingly, we need not consider the parties' additional arguments on equitable estoppel regarding the existence, extent, or severity of any deficiencies in Lake Bluff's plans prior to the changes that corrected them.

from the surrounding circumstances, was improper, but rather, that its retroactive application improperly denied Lake Bluff its vested rights in the property.[7]

Although such distinctions may prove to be significant in a given case, they pale in comparison to the overall, equitable factors the trial court considered paramount in this case. Further, although there are additional factual differences among *Building Heights Cases, Rosenberg, Schroedel, Humble Oil*, and the instant case, we cannot say that the trial court erroneously exercised its discretion when, apparently, it based its conclusion on many factors that this case shares in common with those considered in the other cases: the purchase of property based on a long history of the previous zoning; the planning in cooperation with city authorities based on the previous zoning;[8] the

[7] In this regard, however, the distinction the City attempts to draw is purely academic. As we have noted, in its complaint, Lake Bluff specifically alleged, "The change in the zoning of the Property is retroactive legislation and is unconstitutional, invalid and void." As also noted, the trial court concluded that the City's "actions in denying Lake Bluff's application for a building permit were arbitrary, capricious and invalid."

[8] In its reply brief to this court, the City cites *State ex rel. Lake Drive Baptist Church v. Village of Bayside*, 12 Wis. 2d 585, 108 N.W.2d 288 (1961), and argues, "[v]ested rights to construct a planned building are not acquired by the expenditure of funds or reliance on communication with the local government." In that case, a property owner argued that its "reliance upon favorable intimations of the village board gave it a property right to construct a church on its site," and that it "prepared its first plans after the board manifested a favorable attitude and before the [rezoning]." *Id.*, 12 Wis. 2d at 602-603, 108 N.W.2d at 297-298. Rejecting the property owner's argument that it had acquired vested rights, the supreme court merely stated, "The

252

investment of substantial sums based, in part, on the City's encouragement and directions; and the "eleventh-hour attempt" to rezone the single, specific property.

██

As we explained in *Keane*, the demonstration of a clear legal right and a positive and plain duty are "legal prerequisites that *must* be satisfied" as a prelude to the trial court's consideration of discretionary, equitable factors. *Keane*, 186 Wis. 2d at 647, 517 N.W.2d at 521. Typically, therefore, a court considering mandamus will have little if any reason to analyze equitable considerations until a clear right and plain duty have been established. That is not to say, however, that equitable considerations are always and absolutely absent from the determination of whether a clear right and plain duty exist.[9] Indeed, in *Schroedel*, the supreme court

---

record does not disclose the extent of any expenditure during that period, and we do not find that the principle of the *Rosenberg Case* is applicable." *Id.*, 12 Wis. 2d at 603, 108 N.W.2d at 298.

Thus, although the applicability of *Bayside* may be somewhat unclear, at least in this regard it implicitly supports Lake Bluff's premise that the City's "favorable attitude," in combination with other facts *including* the specific "extent of any expenditure," can render the acquisition of vested rights.

[9] Such equitable considerations may have particular importance in disputes where a property owner claims improper denial of land use by a government entity. *See Old Tuckaway Assocs. Ltd. Partnership v. City of Greenfield*, 180 Wis. 2d 254, 283-284, 509 N.W.2d 323, 334 (Ct. App. 1993) (Schudson, J., concurring) (A property owner has a cause of action for intentional denial of due process when a city allegedly employs "improperly motivated pretexts to postpone and deny" application for a planned use development. "If . . . the City never intended to provide a decision on the merits and, as a result, its

also viewed the arguable existence of vested property rights through an equitable lens. The supreme court noted that there was evidence before the trial court to support its conclusion that "the rezoning [was] arbitrary and unreasonable." *See Schroedel*, 257 Wis. at 383, 43 N.W.2d at 352. With approval, *Schroedel* cited a New Jersey decision that considered some of the equitable factors that also were of apparent importance to the trial court in the instant case:

> "Clearly this was an eleventh-hour attempt to prevent this relator from using her property for its highest use and for which it had been zoned for seven years, during which time its assessed value had been substantially increased because it was so zoned. Such action was ill-advised, capricious and unreasonable. It was doubtless precipitated because of public excitement and clamor."

*Id.*, 257 Wis. at 384, 43 N.W.2d at 353 (quoting *Vine v. Zabriskie*, 3 A.2d 886, 887 (N.J. 1939)). Similarly, in *Humble*, despite the absence of vested rights, the supreme court's determination was explicitly connected to equitable considerations:

> Equitable considerations bar the town from giving Humble such a fast shuffle at this late stage in the game. . .. [I]t is apparent that the town officials were trying to keep one jump ahead of Humble and were attempting to change the rules after they had been haled into court for what Humble believed was arbitrary, unreasonable, and capricious action.
> The situations in *Schroedel* and in the instant case are similar in that in both cases there was a last-minute effort by the city to zone out a use.

---

hearings and procedures were a sham, then neither formal compliance with procedures nor theoretical tenability of a denial would make any difference.").

*Id.*, 25 Wis. 2d at 14, 130 N.W.2d at 311.[10]

Here, the trial court carefully considered the facts of record and the appropriate law and made a reasoned and reasonable determination. Although the City has offered several cogent arguments, we cannot say that the trial court erroneously exercised discretion in concluding that Lake Bluff was entitled to mandamus.

*By the Court.*—Judgment affirmed.

FINE, J. (*dissenting*). It is not disputed that when Lake Bluff filed its application for a building permit on August 5, 1993, Lake Bluff's plans did not comply with the then-existing C-2 zoning code. Lake Bluff did not, therefore, have a clear legal right to a building permit based on that application. Accordingly, any mandamus action brought by Lake Bluff to compel South Milwaukee to issue such a permit would have failed. *See Keane v. St. Francis Hosp.*, 186 Wis. 2d 637, 646, 522 N.W.2d 517, 520 (Ct. App. 1994) (party seeking mandamus "*must*" show a " 'clear legal right' " to the requested relief) (emphasis in original, citation omitted).[1] Indeed,

---

[10] Indeed, the overriding importance of equitable considerations is all the more pronounced when we consider that, in *State ex rel. Humble Oil & Refining Co. v. Wahner*, 25 Wis. 2d 1, 130 N.W.2d 304 (1964), the court granted Humble's petition for a writ of mandamus despite what the court concluded was the *absence* of vested rights. *See id.*, 25 Wis. 2d at 13, 130 N.W.2d at 310 ("[T]he fact that Humble did not have any vested rights at the time the new ordinance was adopted does not mean that the town could deny Humble a building permit on the ground that . . . the new ordinance absolutely barred filling stations in the area.").

[1] Although Lake Bluff might have had a clear legal right to have its August 5 application considered by South Milwaukee

had South Milwaukee issued the requested building permit, that permit could not have authorized Lake Bluff to develop its property in conformity with the application filed August 5. *See Jelinski v. Eggers,* 34 Wis. 2d 85, 93, 148 N.W.2d 750, 755 (1967) ("a building permit grants no vested rights to unlawful use") (upholding trial court's order that property owner remove garage constructed in violation of code but pursuant to building permit).

It is also not disputed that when Lake Bluff refiled its application for a building permit on March 10, 1994, Lake Bluff's plans did not comply with the then-existing R-A zoning code (or the old C-2 zoning code, for that matter). Lake Bluff did not, therefore, have a clear legal right to a building permit based on that application either. Accordingly, any mandamus action brought by Lake Bluff to compel South Milwaukee to issue such a permit should also fail. *See Keane,* 186 Wis. 2d at 646, 522 N.W.2d at 520. Nevertheless, the trial court granted mandamus to Lake Bluff, and the majority affirms. In my view, both the trial court and the major-

within a certain time, Lake Bluff never sought that relief. Indeed, as the majority concedes, only silence met the South Milwaukee city attorney's query to Lake Bluff on August 24, 1993: "If there is some reason that [review of the building-permit application] ought to be advanced and expedited, please advise me." Rather, as noted by Lake Bluff's attorney during oral argument, Lake Bluff decided to try to use the political process in an attempt to head off the looming rezoning. That attempt failed, and on November 2, 1993, the land was rezoned to R-A. Lake Bluff *has never* challenged either the R-A classification or the rezoning process, and waited some four months, from November 2, 1993, when the land was rezoned from C-2 to R-A, to March 10, 1994, to seek legal redress at all.

ity ignore clear Wisconsin precedent to accomplish a result they desire.

It is the law in Wisconsin that a landowner does not get "vested rights" in a zoning classification by merely spending substantial sums in reliance on that classification. *State ex rel. Humble Oil & Ref. Co. v. Wahner*, 25 Wis. 2d 1, 13, 130 N.W.2d 304, 310 (1964) (Humble Oil did not acquire vested rights in a zoning classification by obtaining an option on the land, exercising that option, and by going "to considerable expense in developing plans for the development of the site."). Rather, at the very least, a building-permit application that conforms to the zoning requirements must be filed *before* the land is re-zoned. *Id.*, 25 Wis. 2d at 13-14, 130 N.W.2d at 310-311 (zoning ordinance could not be changed to adversely affect Humble Oil "more than a year after Humble's first petition for a permit and one month after Humble had started these court proceedings based on the ordinance in effect" at the time). *See also Jelinski*, 34 Wis. 2d at 93, 148 N.W.2d at 755 (building permit issued in violation of building code does not authorize construction contrary to code even if " 'the holder of the illegal permit has incurred expenditures in reliance thereon' ") (citation omitted). None of the cases upon which the majority relies holds that vested rights can attach before the filing of a building permit application that conforms to the existing zoning code; indeed, those cases teach just the opposite.[2]

---

[2] *State ex rel. Schroedel v. Pagels*, 257 Wis. 376, 378–380, 382, 43 N.W.2d 349, 350-352 (1950) (mandamus) (building permit that complied with the then-existing zoning code was applied for prior to rezoning); *Rosenberg v. Village of Whitefish Bay*, 199 Wis. 214, 216-217, 225 N.W. 838, 839 (1929) (declaratory judgment) (building permit sought prior to enactment of

The general rule in this country is that a landowner does not have vested rights *even after issuance of a permit* except "that a substantial change of position in reliance on a permit entitles the permittee to continue and complete the use authorized by the permit, irrespective of subsequent enactments or amendments of the zoning laws." 8 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 25.157, at 701–703 (3d ed. 1991). *See also Humble*, 25 Wis. 2d at 13, 130 N.W.2d at 310 ("Generally, a building permit must be *obtained* before vested rights arise.") (emphasis added). By permitting vested rights to accrue upon the *filing* of a permit application that conforms to the then-existing code, Wisconsin has greatly expanded the protection given to landowners who seek to develop their property. I am aware of no Wisconsin authority, however, and the majority cites none, that grants vested rights upon the mere expenditure of substantial sums of money without the concomitant filing of a building permit application that fully complies with the then-existing zoning code. *See Jelinski*, 34 Wis. 2d at 93, 148 N.W.2d at 755 (building permit issued in violation of building code does not authorize construction contrary to code even if " 'the holder of the illegal permit has

---

new ordinance); *Building Height Cases*, 181 Wis. 519, 531, 532–533, 533, 195 N.W. 544, 549, 549, 550 (1923) (telephone company had "acquired a building permit . . . and had actually entered upon the further construction of the building, all prior to the passage of the law" limiting the height of certain buildings; law applicable to the Hotel Wisconsin's attempt to add a ninth story to its building where owner "made no application for a building permit until after passage and publication of said act"; prior to the passage of the act, the Piper Brothers had been granted a permit to build their hotel in Madison).

incurred expenditures in reliance thereon' ") (citation omitted).

The law must be sufficiently predictable so that men and women can conduct their business with the assurance that the rules are not going to change in mid-stream. This requires that judges follow precedent. We must not, like the apocryphal "Eastern despot" mentioned by Sir Frederick Pollock and Frederic William Maitland in the introduction to their seminal treatise on the common law, "deal with every case according to the impression of the moment." 1 F. POLLOCK & F.W. MAITLAND, THE HISTORY OF ENGLISH LAW xxvii (2d ed. 1899). It is the majority's "impression" that Lake Bluff should win this case; and so it does.[3]

---

[3] According to Louis Nizer, Justice Benjamin Nathan Cardozo "defined judicial process as the instinctive reaching of a conclusion and with subsequent research and reasoning to justify it." LOUIS NIZER, MY LIFE IN COURT 444 (1961). That has it backwards. At times, of course, "subsequent research" contradicts the "instinctive conclusion" or the "impression of the moment." When that happens, the result-oriented judge bends precedent. Thus, for example, in its haste to uphold the trial court's "exercise of discretion," as it phrases it, the majority has transformed the precise and correct analysis of the law in *Keane v. St. Francis Hosp.*, 186 Wis. 2d 637, 522 N.W.2d 517 (Ct. App. 1994), that a party seeking mandamus relief "*must*" first show a " 'clear legal right' " to the requested relief *before* "additional discretionary, equitable considerations" are reached, *id.*, 186 Wis. 2d at 646, 522 N.W.2d at 520 (emphasis in original, citation omitted), to something more fuzzy and, in my view, incorrect: "*Typically*, therefore a court considering mandamus will have little if any reason to analyze equitable considerations until a clear right and plain duty have been established. That is not to say, however, that equitable considerations are always and absolutely absent from the determination of whether a clear

People have a right under the law to control the aesthetics, environment, and population density of their community. Section 62.23(7), STATS. By expanding the concept of "vested rights" beyond the parameters of existing law, the majority erodes this right. Although this court has substantial law-making responsibilities, *see Vollmer v. Luety*, 156 Wis. 2d 1, 15 n.4, 456 N.W.2d 797, 804 n.4 (1990), we may not decide cases contrary to supreme court precedent. I respectfully dissent.

right and plain duty exist." Majority op. at 253 (emphasis added). Significantly, Judge Schudson, the author of the majority opinion, also wrote *Keane*.

Although I admire Cardozo, as we are all taught in law school to do, his result-first, reasoning-later approach is a dangerous jurisprudential methodology to adopt. Further, "Cardozo defended the right of a judge to deliberately misstate facts: 'I often say that one [a judge writing a judicial opinion] must permit oneself, and that quite advisedly and deliberately, a certain margin of misstatement' (*Selected Writings* 339, 341)." R.A. POSNER, CARDOZO 43 (1990). (Bracketing and parenthesis in original.) Deliberate misstatements of the record is but one way the result-oriented judge forces the square peg of the desired decision into the round hole of the law; taking a rasp to the hole is another. The majority has not misstated the record; it has, however, ignored clear precedent.