JOURNAL ENTRY and OPINION
{¶ 1} Plaintiff Young Israel of Beachwood sought a zoning change for property zoned for residential use that it owned within defendant city of South Euclid. Young Israel wished to sell the land to a commercial developer since its value as commercial property significantly outweighed its value as residential property. The city opposed this request, wishing to maintain the residential character of the neighborhood. Young Israel then filed an action for declaratory relief, asking the court to declare the city's zoning law to be unconstitutional as applied to it. The court found that the city set forth a legitimate interest in maintaining the residential character of the community, hence Young Israel had not shown that the zoning ordinances denied it any economically viable use without advancing a legitimate governmental interest.
 I {¶ 2} Young Israel's first, eighth, ninth and tenth assignments of error collectively argue that the court erred by holding the zoning law constitutional, as applied to its property, when the evidence established the contrary conclusion.
 {¶ 3} A party challenging the constitutionality of a zoning ordinance can do so in two different ways. First, there can be a facial challenge to zoning law. This means that the party challenges the ordinance on the basis that it lacks any rational relationship to a legitimate governmental purpose and therefore the law cannot be applied under any circumstances. State ex rel.Bray v. Russell, 89 Ohio St.3d 132, 137, 2000-Ohio-116. Second, a party may challenge the law as being unconstitutional "as applied." This means that an otherwise valid law is rendered invalid when enforced against the party making the challenge.Yajnik v. Akron Dept. of Health, Hous. Div.,101 Ohio St.3d 106, 2004-Ohio-357.
 {¶ 4} Young Israel challenged the residential zoning classification as being unconstitutional as applied to it. InJaylin Investments, Inc. v. Village of Moreland Hills,107 Ohio St.3d 339, 2006-Ohio-4, the supreme court set forth the applicable law for "as applied" zoning challenges of the kind involved here. The issue centers on the exercise of legislative power to enact laws which bear a substantial relation to the public health, safety, morals, or general welfare of the community. Id. at ¶ 13. The supreme court went on to set forth the applicable standard:
 {¶ 5} "In a constitutional analysis, the object of scrutiny is the legislative action. The zoning ordinance is the focal point of the analysis, not the property owner's proposed use, and the analysis begins with a presumption that the ordinance is constitutional. The analysis focuses on the legislative judgment underlying the enactment, as it is applied to the particular property, not the municipality's failure to approve what the owner suggests may be a better use of the property. If application of the zoning ordinance prevents an owner from using the property in a particular way, the proposed use is relevant but only as one factor to be considered in analyzing the zoning ordinance's application to the particular property at issue." Id. at ¶ 18.
 {¶ 6} In short, the court had to examine the city's rationale for deciding to zone the subject property as residential and determine whether "the ordinance was `clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare'" as applied to the owner's property. Goldberg Cos., Inc. v. Richmond Hts. CityCouncil, 81 Ohio St.3d 207, 210, 1998-Ohio-456, quoting Euclidv. Ambler Realty Co., 272 U.S. at 395 (internal quotation marks omitted). Given the factual determinations required of the court in this declaratory judgment action, we review the court's factual findings to determine whether it was supported by competent, credible evidence going to all the essential elements of the case. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, syllabus.
 B {¶ 7} The city is an inner-ring suburb located in the northeast quadrant of Cuyahoga County, about eight miles from downtown Cleveland. In 1999, the city commissioned an urban planner to create a "master plan" for the city. This plan was to provide "a broad guide to provide direction and purpose and aid the community in making land use and development decisions while providing a framework for legislative and administrative action * * *."
 {¶ 8} The city contemplated that the plan would:
 {¶ 9} "[P]rovide ways that the City can maintain a balanced tax base, provide economic development, and ongoing techniques to assure sustained marketability of the city's existing land uses with respect to property maintenance, avoiding or eliminating obsolescence, suitable infrastructure, community facilities, city services, and private support services including retail, churches and recreation."
 {¶ 10} An urban planner submitted a "comprehensive plan" which the city adopted in April 2000. The plan noted that as of 1990, 86 percent of the dwelling units in the city were single-family detached homes. The city derives 81 percent of its real estate tax base from residential property, a number higher than similar communities within Cuyahoga County. The plan found this fact significant:
 {¶ 11} "[G]enerally, single-family residential property generates less in local real estate taxes than the related cost of services. Conversely, non-residential development generates more tax revenue than the cost of services associated with its development. When the proportion of moderately valued housing in a community is high, the resultant negative impact to the tax base can be considerable."
 {¶ 12} The plan found that in order to affect a 10 percent shift in tax base from residential to commercial would require approximately 175 to 250 acres of commercial development. This kind of development would be impossible within the city since "there is virtually no vacant land available for this amount of residential development." The city therefore had two options for effecting a significant change in the tax base: replace the residential areas with nonresidential development or increase the intensity of nonresidential development to a significantly higher level than that currently existing.
 {¶ 13} The plan found that nonresidential development would be problematic. It noted that there had been significant commercial development in nearby cities. This meant that commercial development by the city would be redundant to that existing in other communities and likely unattractive for developers. The plan also noted that replacement of existing commercial structures would not likely result in a significant increase to the nonresidential tax base because current property lines resulted in lots that were too small for contemporary commercial development. This limited the options for large-scale commercial use.
 {¶ 14} To compound its problems, the city had an aging population base. As of 1990, 23 percent of the city's residents were 65 years of age or older. The plan noted that the city had no housing specifically designed for seniors. This limited options for seniors who might wish to sell their houses but remain in the city as residents.
 {¶ 15} The plan also noted that younger home owners were faced with fewer options in the city. The relatively small size of homes and lots did not meet the expectations of current buyers. Most of the city's housing is considered "starter," meaning that first-time home buyers generally consider these houses as transitional. The plan concluded that these buyers would only remain in the city's housing until they could afford to purchase larger homes located outside the city.
 {¶ 16} Given these realities, the plan suggested that the city explore creating higher density housing. Higher density housing refers to living space that accommodates more persons per acre than that of single-family homes. High density housing has several beneficial effects for the city: it increases the tax base by permitting more taxpayers within a defined area, it caters to seniors, "empty nesters," and younger home owners without children who might look outside the city for housing, and it decreases the burden on the school system since most persons occupying high density housing do not have children. Hence, among the suggestions made for developing an overall objective for residential housing were to provide housing choices that "meet the needs of today's buyer with respect to * * * [t]he availability of alternative housing choices (i.e., clustering, retirement, new apartments) to meet the needs of residents in all phases of their `life cycle.'"
 C {¶ 17} The subject property is a 1.57 acre parcel located on the northeast corner of Cedar and Miramar Roads. Cedar Road divides the cities of South Euclid and University Heights, with South Euclid lying north of University Heights. The property is zoned residential R-50, meaning that lots must have a minimum area of 6,000 square feet with a minimum lot width of 50 feet. It has a 415 foot frontage on Cedar Road and is 165 feet deep. There is residential housing located directly north and east of the property. An apartment complex is located on the southeast corner of the intersection in the city of University Heights, and a three-story medical building occupies the southwest corner of the intersection, also in University Heights. Directly west of the property, on the northwest corner of the intersection, is a fast-food restaurant.
 {¶ 18} The property is one block from the intersection of Cedar and Warrensville Roads. This intersection is heavily commercial, with a 500,000 square foot retail development known as "University Square" anchoring the corner. In 1999, a traffic survey showed 22,000 cars per day used Cedar Road. That number is likely low since that traffic survey predated the opening of University Square. There was evidence that the retail stores of University Square could be seen from the subject property.
 {¶ 19} Young Israel has owned the property since the 1950s. In 1956, Young Israel obtained a permit for a nonconforming use and built a synagogue on the property. See Young IsraelOrganization v. Dworkin (1956), 105 Ohio App. 89. In 2002, Young Israel merged with a congregation from Beachwood. As part of the merger, Young Israel agreed to close its synagogue. To finance its end of the merger, Young Israel explored the possibility of selling its property for commercial development. It appears that several commercial developers expressed an interest in the property, all offering roughly $1.2 million for the property.
 {¶ 20} Young Israel eventually reached an agreement to sell the land to plaintiff LY Properties. The parties made the sale contingent on LY obtaining a zoning variance, at its own expense.
 {¶ 21} LY asked for the rezoning by submitting evidence in the form of a market study which showed that commercial use for the property would produce a three-times higher return than residential use. The city denied LY's request to rezone the parcel for commercial use. It suggested that the land could have qualified for the conditional use of multi-residential housing known as a planned unit residential development ("PURD"). It perceived a market for townhouse developments in accordance with the master plan.
 {¶ 22} Young Israel appealed to the court of common pleas, seeking a declaration that the city's zoning laws were unconstitutional as applied to the property. The court conducted a trial and refused to find the zoning unconstitutional. It issued findings of fact and conclusions which noted that the city had an interest in maintaining the residential character of the community. The court found that the commercial development proposed for the land would negatively impact the surrounding residences and decrease residential property values. The court also found that Young Israel had not established that the zoning denied them an economically viable use of the property. It noted that a market for PURDs existed within the city and that such development would return a positive, albeit smaller, return on investment. While there had been no application for a variance to permit the conditional use of high density housing (that is, to change the R5-0 density requirements), the court found that "a variance for the density of PURD on the Property would be consistent with the Comprehensive Plan and would increase the value of the Property."
 D {¶ 23} The very limited standard of review set forth inJaylin, that is, whether the city's "legislative judgment" forming the basis for the zoning laws bears a "substantial" relation to the public health, safety, morals, or general welfare, compels our affirmation of the court's finding that the city's zoning classification is constitutional as applied to the subject property.
 {¶ 24} A city's retention of a residential zoning classification can be substantially related to the public health, safety, morals and general welfare of the community. See, e.g.,Leslie v. Toledo (1981), 66 Ohio St.2d 488. As detailed in the comprehensive plan, the city identified itself as being residential in character and adopted a plan that would encourage that status as a matter of policy. Nevertheless, the city recognized that commercial development was crucial to stabilize the tax base. It needed policies to accommodate both residential and commercial uses. To that end, land within the city was divided into three areas. Area one (where the subject parcel is located) was mixed-use and higher intensity development and revitalization development. Area two was residential development/redevelopment at approximately existing densities. Area three was classified as areas for preservation with no redevelopment advocated.
 {¶ 25} Those areas within the boundaries of area one are primarily nonresidential areas and adjacent residential areas which fall below competitive standards. Hence, the plan advocated "highly proactive policies" that enable higher density nonresidential and mixed-use development. These policies, as adopted in the comprehensive plan, called for higher density residential development within area one as a means of stabilizing existing residential areas as well as increasing the number of people living within the area.
 {¶ 26} When the city rejected LY's application for rezoning, it did so on the basis that commercial development would adversely affect that residential character of the neighborhood. It noted the already high traffic count on Cedar Road. It further noted that at least half of the commercial developers interested in the property wanted to develop it into a fast food restaurant. The city resisted this on grounds that it would have a negative effect on the surrounding residential properties. By suggesting high density residential development of the property to LY, the city remained true to its stated vision for the area. The plan expressly recognized that the city "has no housing specifically designed or intended for senior citizens, whether independent, congregate, or assisted living facilities." The city recognized that it must act proactively in order to keep senior citizens from leaving the city. Higher density housing would accomplish that goal.
 {¶ 27} All of the city's concerns are directly related to the safety, health, morals and welfare of its citizens. It is certainly true that commercial development of the property would yield a higher return for Young Israel. That fact does not, however, show that the city's decision is arbitrary or capricious. Jaylin, 107 Ohio St.3d at ¶ 25. The city's plan to remain residential specifically calls for the adoption of housing choices to remain competitive with surrounding communities. The high density PURD would accomplish this stated goal without requiring a zoning change.
 {¶ 28} Young Israel has not argued that the comprehensive plan is quixotic or ultimately adverse to city goals. There is no argument that the plan sacrifices commercial development and a resulting increased tax base for the sake of maintaining a declining and aging housing base that provides incrementally smaller tax revenues as housing values remain static or in decline. Without these kinds of arguments, considered in light of the fair debate standard, any difference of opinion with a master plan adopted by a community is largely doomed to fail underJaylin.
 II {¶ 29} At trial, the city argued that Young Israel had a viable economic use for its property as a PURD. Young Israel countered by offering evidence that zoning laws relating to the density of the property made a PURD economically unfeasible. It noted that current zoning laws only permitted construction of 11 townhouse units on the site, whereas a greater number than that would be necessary. In its conclusions of law, the court stated at ¶ 50:
 {¶ 30} "Plaintiff did not attempt to obtain a density variance for the Property. While attempting to establish the lack of an economically viable use `beyond reasonable debate,' Plaintiffs may not rely on an assumption that a variance could not be economically obtained. Thus, Plaintiffs may not rely on their assertions that a density variance is not feasible when they failed to explore that option."
 {¶ 31} Young Israel maintains that the court found, in essence, that it had failed to exhaust its administrative remedies, even though the city did not plead exhaustion of administrative remedies as an affirmative defense. The city, on the other hand, argues that Young Israel failed to object to its use of the affirmative defense, regardless of whether pleaded or not, and therefore has waived the right to argue it on appeal.
 {¶ 32} We fully agree with Young Israel that the city could not seek dismissal of the complaint on grounds of failure to exhaust administrative remedies. In Driscoll v. AustintownAssoc. (1975), 42 Ohio St.2d 263, paragraph five of the syllabus states, "[t]he doctrine of `failure to exhaust available administrative remedies' is an affirmative defense to a declaratory judgment action challenging the constitutionality of a zoning restriction, and if this defense is not timely asserted in that action, it is waived." There is no question that the city failed to assert exhaustion of remedies as an affirmative defense in its answer, so it could not seek judgment on that basis alone. This is regardless of whether Young Israel objected to the city introducing evidence to that effect.
 {¶ 33} Nevertheless, we have no basis for concluding that the court decided the case on the doctrine of exhaustion of administrative remedies. As previously discussed, the legal issue boiled down to the viability of developing the property for residential use. Young Israel maintained that the city's suggestion for a PURD was unfeasible because the property lacked the necessary size to make a PURD economically viable. The city countered by arguing that Young Israel could have asked for a variance from the size restriction, but failed to explore that possibility.
 {¶ 34} There is a large distinction between using exhaustion of administrative remedies as an affirmative defense in the classic sense and offering evidence going to the existence of viable alternatives for residential development. When a defendant sets forth an affirmative defense, the defendant concedes the facts constituting the plaintiff's prima facie case but asserts that an independent set of facts or laws disinvests the plaintiff of a claim to relief. The law is clear that the city's failure to plead exhaustion of administrative remedies waived its right to seek judgment on Young Israel's declaratory judgment action. That failure did not, however, bar the city from arguing that Young Israel had failed to explore other avenues of residential use for the property.
 {¶ 35} Our holding is reinforced by other legal conclusions by the court. In ¶ 47, the court concluded that "[a] variance for the density of the PURD on the Property would be consistent with the Comprehensive Plan and would increase the value of the Property." In ¶ 49, the court concluded that "[a] density variance for increased density for a PURD on the Property is possible."
 {¶ 36} In neither of these findings could it be said that the court specifically rested its judgment on Young Israel's failure to exhaust administrative remedies. Instead, the court's conclusions of law show that the court did not base its judgment on this factor alone, but as part of an overall view going toward the viability of alternative residential uses.
 III {¶ 37} In a related argument, Young Israel complains that the court erred by permitting Cal Caminati, the city's economic development manager, to testify that LY should have sought a density variance for the PURD conditional use before submitting its application for a conditional use permit to the city planning commission. This testimony was an analog of the city's argument that Young Israel could have explored residential housing options for developing the property. Young Israel also complains that the court erred by permitting the city to offer the testimony of residential developers who said that they believed a PURD of the kind envisioned by the city would be viable for the property.
 {¶ 38} In light of the analysis dictated by Jaylin, Young Israel's complaints regarding alternative high density residential uses for the property are largely immaterial. Since our task is to determine whether the city properly exercised its legislative judgment in choosing to promote residential development, the kinds of residential uses available for development are only marginally relevant. This is not a case where Young Israel has alleged that the zoning classification operates as a governmental taking of the land such that the land has no value whatsoever. The land has value for residential development — it just does not have as high a value as it would for commercial development. So in the end, testimony relating to alternative uses of the land has no bearing on the exercise of legislative prerogative in classifying the property as residential.
 {¶ 39} We reach a similar conclusion with respect to Young Israel's arguments relating to the city's openness to grant a variance for density requirements on the subject parcel. To be sure, the city's evidence was self-serving and possibly improper. It is difficult to see how the city can cite the zoning code to deny a variance for a use that it disapproves, but rather openly declare that it would grant a variance for a use it does approve. Yet, the city's position that it would be open to granting a density variance for a PURD is arguably consistent with its stated exercise of legislative judgment to maintain the residential character of the city. This consistency at least underscores the city's commitment to high density residential development as an exercise of legislative judgment. Viewed in this manner and under the applicable standard of review, we cannot say that the court erred by permitting the contested testimony.
 IV {¶ 40} Finally, Young Israel complains that the court erred by dismissing its mandamus claim for relief which sought damages for inverse condemnation. Given our disposition of the other assignments of error, Young Israel concedes that this claim is now moot.
 {¶ 41} Likewise, the city agrees that its cross-assignment of error would be rendered moot in light of an affirmation of the court's judgment.
Judgment affirmed.
It is ordered that defendant-appellee/cross-appellant recover of plaintiffs-appellants/cross-appellees its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Calabrese, Jr., J., concurs.
 Cooney, P.J., concurs in judgment only.